IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2019 Session

**WILLIAM EDWARD ARNOLD, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1778    Joseph P. Binkley, Jr., Judge[1]**

_____

**No. M2018-00710-CCA-R3-PC**
_____

The Petitioner, William Edward Arnold, Jr., appeals from the Davidson County Criminal Court's denial of post-conviction and error coram nobis relief from his convictions for one count of aggravated sexual battery and three counts of rape of a child, for which he received an effective sentence of twenty-five years. After a careful and laborious review of the entire record, we are compelled to reverse the denial of post-conviction relief. Accordingly, the Petitioner's convictions and sentences are reversed and vacated, and this case is remanded to the trial court for a new trial and for any necessary pre-trial motions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Remanded for New Trial**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick T. McNally, Nashville, Tennessee, for the Petitioner, William Edward Arnold, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Joseph E. Clifton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Sometime in November 2010, N.M.,[2] the minor victim, reported to his mother, S.B., that the Petitioner, his mentor from the Big Brothers Big Sisters Program, had

---

[1] Although this is a Davidson County Criminal Court case, Judge Joseph P. Binkley, Jr., of the Fifth Circuit Court of Davidson County, heard this case by interchange. See Tenn. Crim. App. § 17-1-203.

[2] It is the policy of this court to identify minor victims by their initials only. We will also identify the minor victims' family members by their initials in order to protect the identity of these victims.

sexually abused him. At trial, the victim testified in graphic detail as to several instances of sexual abuse by the Petitioner including two instances in the Petitioner's basement during which the Petitioner forced the victim to engage in fellatio and two instances in the den area of the Petitioner's home when the Petitioner forced the victim to engage in anal sex. The victim said he did not disclose the Petitioner's abuse to his mother until November 2010, when he and his mother began arguing about a sexual conversation that the victim had been having with a boy from school on the internet. The victim said his mother gave him a "whupping" with a belt and later questioned him about whether different people had touched him inappropriately. He said his mother asked whether his three uncles, her friends, her boyfriends and ex-boyfriends, and her father touched the victim inappropriately. When his mother said "William's name," the victim "didn't respond" and "looked down." He said his mother asked him again, and he looked at her and nodded his head, and then he started to cry. He said his mother got a Bible, and he put his hand on the Bible and swore that "William" touched him, although he did not "go into detail about it." Afterward, his mother called the police.

The victim also confirmed at trial that he had sexual contact with W.C.L., a minor and the brother of his mother's boyfriend, in 2011, after the mentor relationship with the Petitioner had ended. The victim said he had learned about sex from the Petitioner, stating "[i]t felt good with [the Petitioner] so I thought it would feel good with [W.C.L.]." The victim asserted that W.C.L. began coming over to his house in 2010 but that he did not start spending the night at W.C.L.'s house until 2011, when the sexual contact began. The victim maintained that he was not aware that W.C.L. had told the Department of Children's Services (DCS) and the Franklin Police Department that the sexual contact between him and the victim occurred in 2010.

The Petitioner testified in his own behalf at trial. He denied that he had sexually abused the victim. He said he had been assigned as the victim's mentor through the Big Brothers Big Sisters Program in the fall of 2007. The Petitioner said that he had met with the victim weekly at the Boys and Girls Club during the 2007-08 school year but did not see the victim again until January 2009 when he became a community-based mentor for the victim. At the conclusion of the evidence at trial, the trial court granted a motion for judgment of acquittal for counts 1 and 3 charging the Petitioner with aggravated sexual battery. Thereafter, the jury convicted the Petitioner of the remaining charges, and the trial court imposed an effective sentence of twenty-five years.

**Rule 412 Hearings.** The State's evidence against the Petitioner involved the victim's uncorroborated testimony. The Petitioner's defense theory was that he did not commit the offenses, that another individual with the same first name, a teenager named W.C.L., was the individual with whom the victim had engaged in sexual contact for the time period alleged in the indictment, and that the victim's sexual contact with W.C.L.

was the origin of the victim's knowledge of sexual matters. The trial court conducted substantive Rule 412 hearings to determine the admissibility of the purported evidence, a review of which is necessary for resolution of the issues raised in this appeal.

Prior to trial, defense counsel for the Petitioner filed a motion and an amended motion pursuant to Tennessee Rule of Evidence 412 requesting that the court allow the Petitioner to present evidence of specific prior sexual conduct of the alleged victim. The defense sought to present specific incidents of prior sexual conduct to show that the victim had a "motive . . . to lie about the true identity of the person with whom he had sexual relations," "[to] attack [the alleged victim's] credibility and the credibility of the State's [w]itnesses in general," and "to show that [the alleged victim's] knowledge of sexual matters was acquired from a third person[, namely W.C.L.,] and [from] homosexual pornographic material." The specific evidence that the Petitioner sought to present to the jury at trial was the following: (1) "Metro School Record of February 21, 2003 Incident where alleged victim fondled another child's penis in class and later lied to the teacher about who initiated said contact," (2) "Evidence of [of the alleged victim's] Sexual Conduct with [W.C.L.] offered pursuant to Rule 412(c)(1) and (4),"[3] and (3) "Vanderbilt Records: Date of Service July 21, 2011 and March 7, 2012: Source of Information for Cross Examination of Alleged Victim: Regarding Knowledge of Sexual Matters, based upon homosexual pornography, sexual relationship with [] male peers, frequent masturbation causing medical diagnosis "Dysuria.""

In particular, the defense wished to present proof showing that the victim reported that an older child, W.C.L., had sexually assaulted and raped him during the same time period alleged in the indictment against the Petitioner. The defense also argued that W.C.L. and the Petitioner shared the same first name "William" and that the allegations

---

[3] In particular, defense counsel relied on the following portions of Rule 412:

(c) Specific Instances of Conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:

(1) Required by the Tennessee or United States Constitution, or

. . . .

(4) If the sexual behavior was with persons other than the accused,

. . . .

(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters[.]

Tenn. R. Evid. 412(c)(1), (4)(ii).

- 3 -

against W.C.L. contained the same or similar factual scenarios as the allegations against the Petitioner. The defense claimed such proof was admissible pursuant to Tennessee Rule of Evidence 412(c)(1), (4).

At the Rule 412 hearing on September 4, 2012,[4] the defense stated that it believed the State was going to present evidence at trial that the victim's knowledge of sexual matters was obtained from the Petitioner's abuse. The defense argued that if the State presented that evidence, then the State had effectively opened the door, and the defense should be able to present extrinsic evidence during cross-examination of the victim's prior sexual conduct.

At this hearing, D.L.,[5] W.C.L.'s older brother, testified that he moved into the home shared by S.B., the victim's mother, and the victim shortly after S.B.'s surgery in March 2009. He said he introduced his family, including W.C.L., to S.B. and the victim approximately one year after moving in with them. He also said that W.C.L. visited S.B. and the victim at their home two times. D.L. stated that during their relationship, S.B. told him about an incident of a sexual nature that occurred between W.C.L. and the victim. He said that he was with S.B. in February or March 2010 when she informed a detective in Nashville about the incident between W.C.L. and the victim as well the Petitioner's sexual abuse of the victim. D.L. said that the victim told his mother about the incident involving W.C.L. approximately one month after the victim disclosed that the Petitioner had sexually abused him. He said he was not present when S.B. spoke to a detective in Williamson County. D.L. said he moved out of S.B.'s home in August 2011 when his relationship with S.B. came to an end.

---

[4] The September 4, 2012 hearing was heard by Judge Monte D. Watkins. At the end of this hearing, Judge Watkins recused himself from this case because he was acquainted with many of the victim's family members. Thereafter, the case was assigned to Judge Cheryl A. Blackburn, who heard the Rule 412 hearings in this case that took place on February 19, 2013, and March 25, 2013. However, on July 1, 2013, ten days prior to trial, an order was entered transferring the case from Judge Blackburn, a Criminal Court judge, to Judge Joseph P. Binkley, Jr., a Circuit Court judge. This order stated the following:

> For good cause, the above-referenced case is being transferred from Division III Criminal Court to Fifth Circuit Court, Judge Joe P. Binkley, Presiding Judge, for trial on Monday, July 8, 2013. All pre-trial orders have been completed and remain in effect. Judge Binkley will address any non-evidentiary motions in limine.

[5] We have identified this individual by his initials to protect the identity of his minor brother, W.C.L.

- 4 -

At the Rule 412 hearing on February 19, 2013, the victim testified that he knew W.C.L. because his mother's ex-boyfriend, D.L., was W.C.L.'s brother. The victim testified that he first met W.C.L. and the rest of D.L.'s family in January 2011, even though D.L. began dating his mother and moved in with them in 2009. The victim said that between March and late June 2011, he had a consensual "sexual relationship" with W.C.L. at W.C.L.'s house in Franklin, Tennessee. At the time of this relationship, W.C.L. was sixteen years old and the victim was thirteen years old. He said that there were approximately ten incidents between W.C.L. and him involving masturbation and fellatio. The victim also described a June 2011 trip to Beech Bend Park in Kentucky during which W.C.L. attempted to have sex with him. The victim denied telling Detective Mick of the Franklin Police Department or the forensic interviewer at Our Kids Center that he had anal sex with W.C.L., even though video recordings of the victim's interviews with these individuals showed otherwise, and the victim insisted that he did not have anal sex with W.C.L..

The victim stated that in June 2011, after the Beech Bend trip, he told his mother that he and W.C.L. had sexual contact. He said his mother asked him if anything sexual had happened with anyone else, and she brought out a paper and a pen, and he wrote W.C.L.'s name down because he could not say it. He denied saying that his mother kept the sexual contact with W.C.L. a secret. He insisted that his mother did not try to hide W.C.L.'s sexual contact with him because he and his mother informed his counselor about this sexual contact one month after he told his mother about it, and the counselor explained that she was going to have to report W.C.L.'s sexual contact with him to the authorities even though the victim had said it was consensual.

When defense counsel asked whether the sexual contact between him and W.C.L. could have actually taken place in 2010 rather than 2011, the victim said, "No, it happened in 2011." When the victim was asked whether he had spent some time thinking about when this sexual contact with W.C.L. occurred, he stated: "Yes. But really this is irrelevant because I know at the end of the day [the Petitioner] abused me. . . . So all of this [W.C.L.], it's irrelevant because all this happened after the fact of what happened between me and [the Petitioner]." Later, the victim reiterated that he "started having sexual contact with [W.C.L.] after [the Petitioner]." He asserted that he did not know W.C.L. at the time he told his mother about the Petitioner's sexually abusing him because he told his mother about the Petitioner's abuse in November 2010 and he first met W.C.L. in January 2011 and his sexual contact with W.C.L. occurred in the spring and summer of 2011. The victim said his mother had not helped him with the relevant dates regarding W.C.L.'s sexual contact with him because he knew "when it happened."

The victim denied ever texting W.C.L. and denied asking W.C.L. by text to send a photograph of his penis to him. He said he remembered speaking to a police officer at his

home in November 2010 while in the presence of his mother and D.L. and telling this officer that he was sexually abused by the Petitioner.

Although the victim could not state his age when the Petitioner abused him, the victim stated that the sexual contact, which included anal sex, fellatio, and masturbation, occurred "right after Big Brothers Big Sisters closed down." This sexual contact occurred in the Petitioner's car or at his house, and the victim denied that this sexual contact with the Petitioner was consensual. The victim said he first disclosed that the Petitioner sexually abused him in November 2010. He explained that he and his mother were talking and that he "just broke down and started crying" and then told her "that someone touched me." He said that his disclosure of the Petitioner's abuse occurred before W.C.L. had sexual contact with him. He added that his discussions about the Petitioner's sexual abuse of him with police officers, with the forensic interviewer at Our Kids Center, with DCS, and with Luvell Glanton, his attorney in the civil lawsuit he filed against the Petitioner, occurred before W.C.L.'s sexual contact with him took place. The victim acknowledged that during his discussions with those individuals, no one asked him if he had sexual contact with anyone other than the Petitioner.

In addition to hearing testimony from the victim, the trial court also considered the victim's August 1, 2011 forensic interview concerning the allegations against W.C.L., which was admitted into evidence. During this interview, the victim, who had turned thirteen years old on April 10, 2011, stated that his sexual contact with W.C.L., which involved fellatio and anal sex, occurred three to four months prior. He later said that his sexual contact with W.C.L. occurred in May 2011, after his birthday. Over the course of this interview, the victim referred to W.C.L. by the name of "William." The victim asserted there were approximately seven incidents of sexual contact with W.C.L. and that this sexual contact occurred at W.C.L.'s home in W.C.L.'s bedroom. The victim stated that although the fellatio with W.C.L. was consensual, the anal sex with W.C.L. was not consensual. The victim said that W.C.L. gave him anal sex two to three times, and that W.C.L. forced the victim to give him anal sex one to two times, and that none of these incidents of anal sex were consensual. The victim described an incident in which W.C.L. forced him to bend over the bed so W.C.L. could have anal sex with him, which "hurt" the victim. The victim said that the last time he saw W.C.L. was on a family trip to Beech Bend, Kentucky, during the summer of 2011. During this Beech Bend trip, W.C.L. indicated that he wanted to have sex with the victim, but the victim refused and no sexual contact occurred. The victim said that he ultimately told his mother about the sexual contact with W.C.L. when he wrote W.C.L.'s name down on a piece of paper. He said that he did not want to tell his mother about W.C.L. because it felt "regular" and "normal." He added that although he did not want the sexual contact with W.C.L. to happen again, it did happen again and it felt "right." The victim said that after he disclosed this sexual contact with W.C.L., his mother immediately told her boyfriend,

- 6 -

D.L., who was W.C.L.'s brother. The victim said that he and his mother kept the sexual contact with W.C.L. a "secret" for a little while and then disclosed this contact to the Sexual Assault Center. The victim said that he had "no idea" why he and his mother kept his sexual contact with W.C.L. a secret. He stated that when D.L. confronted W.C.L. about the sexual contact with the victim, W.C.L. admitted that it had occurred.

Detective Robert Carrigan with the Metropolitan Nashville Police Department testified that he was the lead investigator regarding the abuse allegations made by the victim against the Petitioner. He said the victim's mother first filed a police report regarding the Petitioner's abuse on November 23, 2010, and shortly thereafter, he spoke with the victim's mother and the victim. He said that generally patrol officers are told to get most of their information from the family member or disclosure witness and then have the child interviewed by a forensic interviewer. He said the victim underwent a forensic interview on December 2, 2010, within a couple of weeks of the initial disclosure, and then was examined in Our Kids Center in Nashville on December 20, 2010.

Detective Carrigan said that he later asked the victim's mother to come in and attempt a controlled phone call with the Petitioner. During their December 8, 2010 meeting, the victim's mother and D.L. mentioned that "there had been some incidents at school [regarding] inappropriate statements [the victim] had made to girls," which had prompted the victim's mother to ask the Petitioner to talk to the victim. He said this was the "only mention of any other sexual issues going on." Detective Carrigan stated that during this meeting, D.L. never said anything about the victim having sex with W.C.L.. He said that if that information had come out, he would have been required to start another investigation into this other suspect separate from the investigation involving the Petitioner. During this meeting, neither the victim's mother nor D.L. mentioned anything about the victim having a sexual relationship with W.C.L., an older teenager.

Detective Carrigan said that on August 8, 2011, he learned that the victim had told a DCS worker in July 2011 that he had sexual contact with W.C.L.. He said that because the sexual contact with W.C.L. had occurred in Williamson County, the case was referred to that county for a follow-up. Detective Carrigan said that sometime after August 8, 2011, he briefly talked to the victim's mother and D.L. about the other case involving W.C.L.'s sexual contact with the victim; however, he said that they did not have a detailed discussion about this other case. He said that there would be no reason for D.L. to have talked to him about W.C.L.'s sexual contact with the victim during his meetings with the victim's mother during the fall of 2010 and the early part of 2011 because those meetings pre-dated the victim's July 2011 disclosure that W.C.L. had sexual contact with him. Nevertheless, Detective Carrigan acknowledged that the sexual contact between

W.C.L. and the victim could have been occurring long before the victim's July 2011 disclosure of it.

At the Rule 412 hearing that was continued to March 25, 2013, W.C.L., who was twenty years old at the time, testified that he did not recall when he first met the victim or when his brother D.L. dated the victim's mother. W.C.L. said he thought the victim was fourteen when he first met him because the victim was "just smart." W.C.L. later acknowledged that someone, perhaps his brother D.L., told him the victim was actually twelve years old when W.C.L. first met him. W.C.L. acknowledged that he spoke with the defense attorneys at the courthouse prior to the September 4, 2012 hearing and told them that he met the victim in 2009; however, he said he "was still unsure at the time" he made that statement.

W.C.L. said that the victim called him on his cell phone, although he never called the victim. He stated that he spent time with the victim both at the victim's house and at his house. When he was asked to describe what happened when he first came into contact with the victim, W.C.L. asked if he could "plead the Fifth." The court informed W.C.L. that he was not in any trouble, that he was not going to get in any trouble, and that the purpose of this hearing was to find out what contact he and the victim had and when this contact occurred.

W.C.L. stated that he had sexual contact with the victim. He said that during one incident, the victim came into his room at his house while he was asleep and gave him fellatio. He said that while he had no idea how old he was at the time, it was before his twelfth grade year in high school. He acknowledged that he graduated from high school in 2011. When the defense asked if this incident would have had to have been in 2010, W.C.L. said, "I don't think so." W.C.L. was unable to state what year this incident had occurred.

W.C.L. said another incident occurred when they were at the victim's home. He said the victim was crawling on the floor and then began touching him sexually and then gave him fellatio. He acknowledged that he also gave the victim fellatio on at least one occasion. W.C.L. said he was "unsure" of how many different occasions he and the victim had sexual contact, although he asserted that their contact was limited to fellatio. W.C.L. said he did not recall watching pornographic movies with the victim.

W.C.L. acknowledged that he had previously talked to both defense attorneys in the conference room. He said he was "unsure" whether he told the defense attorneys that he had sex with the victim five to six years ago. He said he "possibly" remembered being interviewed on videotape by DCS and Our Kids Center about his sexual contact with the victim. W.C.L. stated that he did not recall telling the DCS investigators that the sexual

relationship with the victim ended before Christmas 2010. He said his memory "could have" been fresher about these incidents during those interviews that it was now. W.C.L. acknowledged that if he remembered more details during those interviews, then the information he gave in those interviews was more accurate that what he remembered now.

W.C.L. said that he went on a trip with his family to Beech Bend Park and that the victim was present on this trip. While he acknowledged there was an encounter with the victim in the restroom while at this park, he said that "[n]othing happened" because it was a public area. He did not recall if he said something to the victim or if the victim said something to him. He also said he was "unsure" when the trip to Beech Bend Park occurred but was "pretty sure it was hot outside." He did not remember what grade he was in when this trip occurred. W.C.L. said that all sexual contact with the victim stopped after the trip to Beech Bend Park. He also said that after his brother D.L. stopped dating the victim's mother, he never saw the victim again.

When defense counsel asked if he remembered whether he was still in high school when he was interviewed by DCS, W.C.L. replied, "I do not. Look, I'm going to be honest. I smoke like pot every day, . . . I do not remember." However, W.C.L. denied that he was under the influence of any type of drugs during the hearing.

W.C.L. stated that he stopped having any sexual contact with the victim because he wanted to date other males. He said that the victim once texted him and asked him to send a photograph of his penis, although he did not remember when this occurred or what phone number or cell provider he had at the time. W.C.L. also did not remember what number the victim used to text him.

In addition to hearing testimony from W.C.L. at this hearing, the trial court also considered W.C.L.'s November 9, 2011 interview with DCS and Detective Tamara Mick of the Franklin Police Department. During this interview, Detective Mick informed W.C.L. that the victim had made an allegation that W.C.L. forced him to have anal sex, but W.C.L. denied this allegation. W.C.L. acknowledged that he had had sexual contact with the victim; however, he asserted that this sexual contact involved fellatio and that it had occurred approximately eight times a year ago. W.C.L. said that he had been seventeen years old at the time of the contact and that he had informed the victim of his age. When Detective Mick informed W.C.L. that the victim would have been twelve years old at the time of their sexual contact, W.C.L. replied that the victim kept telling him he was fourteen years old. W.C.L. asserted that the sexual contact with the victim occurred at both the victim's home and his home. He said that this sexual contact occurred over a period of four or five months and that his sexual conduct with the victim ended prior to Christmas 2010. W.C.L. asserted that in November 2010, he began dating

another male, and all sexual contact with the victim ended when he began dating this individual. W.C.L. added that he then had relationships with males other than the victim in January 2011, February 2011, and July 2011. W.C.L. said that shortly before the sexual contact with the victim ended, the victim obtained his cell phone number and texted him trying to get W.C.L. to send him a photograph of his penis, but W.C.L. refused. W.C.L. also said he was aware of the victim having sexual contact with another friend. He said that the victim's mother had discussed another case involving a rich man, the victim's mentor, whom she was suing. He said the victim's mother had talked about how she was going to spend the money she got from that lawsuit. W.C.L. said the victim never talked to him about the abuse that allegedly occurred with the mentor.

The trial court also considered the November 9, 2011 and December 16, 2011 narrative reports concerning the victim's allegations against W.C.L. written by Detective Tamara Mick of the Franklin Police Department. In these reports, Detective Mick noted that she had spoken to the assigned prosecutor, who had "advised that the time frame [of the sexual contact] provided by the suspect, [W.C.L.], appeared at this point to be more reliable [than the victim's time frame] due to [W.C.L.] being able to provide details as to why he believed the incident occurred in November 2010." Detective Mick said the prosecutor also "advised that without the victim providing information to substantiate the time frame of May 2011 [for the sexual contact with W.C.L], she would recommend accepting [W.C.L.]'s time frame with reference information to support it. Then Detective Mick included the following note:

> [The prosecutor] and I discussed that if we accepted the time frame of November 201[0] for the sexual assault incidents, then [W.C.L.] would have been 17 and the victim would have been 12 at the time of the assaults. [The prosecutor] stated based on this information[, W.C.L.] would have to be charged in Juvenile Court for "Rape of a Child." She advised that would then require that the case be transferred to Circuit Court due to the suspect now being an adult. She advised in this case she would not request the case be transferred and that [the] case "would not go anywhere" if it was not transferred. She advised it would be dismissed in Juvenile Court if the charge of Rape of a Child was not transferred to Circuit Court.
>
> NOTE:
>
> Due to DCS Black not being able to establish contact with the victim's mother and [the prosecutor's] stating she would not transfer the case to Circuit Court, this case is being closed by Exception.
>
> CASE STATUS:

- 10 -

This case is CLOSED by EXCEPTION, Lack of victim cooperation

.

The victim's mother, S.B., testified that she began dating W.C.L.'s brother, D.L. at the end of March 2009, while she was recovering from surgery. In April 2009, D.L. moved into the home where S.B. and the victim lived. S.B. said that she and the victim first met D.L.'s family in Franklin in December 2009 or January 2010. On cross-examination, she admitted that she and the victim actually met D.L.'s family in April or May 2009. S.B. said that the victim first spent the night at W.C.L.'s home without her on two occasions in 2010 or 2011. She also said that W.C.L. spent the night at her home when she was there and that W.C.L. would sleep on her couch. She said there was one occasion during the "later part of 2010" when W.C.L. and his younger sister babysat the victim and his younger brother; however, she said she returned home around 1:00 a.m. that night.

S.B. said that on November 21, 2010, the victim informed her that he had been sexually abused by the Petitioner . She asserted that the victim, in November 2010, was not spending time with W.C.L. without her; however, she acknowledged that the victim began spending more time with W.C.L. around December 2010 or January 2011. S.B. confirmed that she and the victim attended a trip with W.C.L. and his family to Beech Bend Park during a summer holiday in 2011. She said that she remembered this trip happening during the summer of 2011 because D.L. left a couple of months later.

S.B. said that from November 2010 to May 2011, the victim was seeing a counselor because he had been sexually abused by the Petitioner. She said that sometime "right after the Beech Bend" trip, the victim informed her of a "sexual relationship with [W.C.L.] that occurred "again in January" 2011 and then during the Beech Bend trip the summer of 2011. She said the victim disclosed "what his part was as well as [W.C.L.]'s part" and told her that "he was ashamed of it, he didn't like it, he didn't understand why he wanted to do it." The victim said he "had urges from the original abuse," and she told him to talk about it with his therapist in counseling. S.B. said the victim told her that all of his sexual activity with W.C.L. was a response or reaction to his abuse by the Petitioner. S.B. said the victim told her about W.C.L.'s sexual contact with him on a Sunday, and she and the victim disclosed it to the therapist the following day, on Monday, and the therapist concluded that she needed to report this sexual contact to DCS. S.B. said that she did not immediately contact DCS because W.C.L. was a teenager, but she denied keeping it a secret. She said that the victim never indicated that he was

- 11 -

already engaged in a relationship with W.C.L. during the time that he was being mentored by the Petitioner.

At the conclusion of the March 25, 2013 hearing, the court asserted that there were two issues relevant to the Rule 412 motion: (1) "whether or not any of this [evidence] is admissible in cross-examination of [the victim], and (2) "even if that's admissible what other extrinsic evidence might or might not be admissible." During closing arguments, defense counsel initially contended that the specific incidents of sexual conduct were admissible under Rule 412(c)(1) and (4). However, he later acknowledged that none of the subsections of (c)(4) applied and that the evidence of the victim's sexual conduct with W.C.L. was admissible under (c)(1) because it was "required by the United States constitution in the confrontation clause." He explained that it was admissible under the constitution "[b]ecause [W.C.L.] is the one that [the victim] had a sexual relationship with" and "in order to disguise and protect that relationship[,] . . . [the victim] . . . accused [the Petitioner] of committing that crime." Defense counsel also argued that the Petitioner should be allowed to present this evidence pursuant to State v. Brown, 29 S.W.3d 427 (Tenn. 2000), because "the state constitution and the United States constitution protect[] [the Petitioner's] ability to present this evidence." He asserted that the Petitioner should be allowed to present extrinsic proof of the victim's sexual contact with W.C.L. through W.C.L.'s testimony and through the recording of W.C.L.'s interview with DCS and the Franklin Police Department. He said this evidence showed that the victim's sexual contact with W.C.L. "occurred prior to the disclosure against [the Petitioner]." At that point, the following exchange occurred between the trial court and defense counsel:

The Court: Isn't that what 412 is all about is that you can't slime somebody, for lack of a better word, in some totally other context by bringing in their sexual behavior in order to make them look horrible other than the issue of credibility on the time frame in this case.

Defense Counsel: I don't want to—I think we're going back to the first prong again.

The Court: That's assuming I even allow you to ask [the victim] the questions. How are you not stuck with the answers?

Defense Counsel: Well, Your Honor, I think that—

The Court: Specific instances of conduct, go back to 608.

- 12 -

| | |
|---|---|
| Defense Counsel: | But, Your Honor, this would be directly on point with regard to whether or not [the Petitioner]— |
| The Court: | It has to do with credibility.  But you're saying it has to do with his credibility. |
| Defense Counsel: | What I'm saying is that [the Petitioner] never committed these acts, and [W.C.L.] did. |
| The Court: | Okay. |
| Defense Counsel: | And the jury needs to be able to hear that based upon the constitution, the United States [C]onstitution— |

The State argued against the admission of this evidence under Rule 412, stating, "[Based on the case law,] it's really extraordinary circumstances wherein a constitutional argument is going to trump the rape shield law and the reasons behind the rape shield law.  We don't have them here."  The trial court informed the parties that it was going to take the Rule 412 motion under advisement and then issue a written order.

On May 14, 2013, the trial court entered an order granting in part and denying in part the defense's Rule 412 motion.  In it, the court stated that it was presented with the following issues:  (1) "Whether any evidence pertaining to the Victim's past relationship with [W.C.L.] is admissible during the cross-examination of [the victim], and (2) "[I]f so, whether any extrinsic evidence (e.g., the testimony of [W.C.L.], police reports, etc.) is admissible."  As to whether the evidence of the victim's sexual relationship with W.C.L. was admissible during cross-examination under Rule 412, the trial court stated that the defense only sought admissibility of this evidence under Rule 412(c)(4), even though the defense contended in its motion and throughout its closing argument that the evidence of the victim's sexual relationship with W.C.L. was admissible pursuant to Rule 412(c)(1) because it was required by the Tennessee or United States Constitutions.  The court made the following findings and conclusions pursuant to Rule 412 in its order:

> In the Amended Motion, the defense argues the evidence of the prior sexual relationship is admissible pursuant to subsection (c)(4).  Thus, the victim's sexual behavior with a person other than the defendant may be admissible under the rule only to (1) rebut/explain scientific evidence, (2) prove source of semen/injury/disease (or knowledge in the case of a child

victim), or (3) to prove consent, but only if there is a pattern. Tenn. R. Evid. 412(c)(4). However, during Court questioning at the evidentiary hearing, the defense conceded that the evidence they seek to introduce is not admissible pursuant to [Rule] 412 because consent is not at issue (since the defense is arguing the acts never occurred) and none of the reasons set forth in section (c)(4) apply [to] the facts in this case. Thus, evidence regarding the prior sexual relationship is inadmissible pursuant to Rule 412.

Under a heading labeled "Due Process," the trial court later stated, "Although the evidence is not admissible pursuant to the exceptions enumerated in Rule 412, it does not mean that all the testimony sought is prohibited under all grounds." The court then made the following findings and conclusions:

The defense argued that evidence regarding the Victim's prior sexual relationship with [W.C.L.] is relevant because regardless of the contradicting testimony as to when the sexual relationship may have occurred, it is clear it falls within the 2007-2010 time frame alleged in the indictment.

The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense. State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000) (citing Taylor v. Illinois, 484 U.S. 400, 408 (1988); Washington v. Texas, 388 U.S. 14, 23 (1976); Chambers v. Mississippi, 410 U.S. 284, 302 (1973); Sheline, 955 S.W.2d at 47). As the Tennessee Supreme Court stated in Brown:

Although "[t]he right to present witnesses is of critical importance . . . it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process." Chambers, 410 U.S. at 295, 93 S Ct. at 1046. Specifically, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilty and innocence." Id. at 302, 93 S. Ct. at 1049. However, these procedural and evidentiary rules of exclusion "may not be applied mechanistically to defeat the ends of justice." Id. "Such rules do not abridge an accused's right to present a defense so long

- 14 -

as they are not 'arbitrary' or disproportionate to the purposes they are designed to serve.'" United States v. Scheffer, 523 U.S. 303, 118 S. Ct. 1261, 1264, 140 L.Ed.2d 413 (1998) (quoting . . . Rock v. Arkansas, 483 U.S. 44, 56, 107 S. Ct. 2704, 2711, 97 L.Ed.2d 37 (1987)).

Brown, 29 S.W.3d at 432-33. The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. Brown, 29 S.W.3d at 433-34.

As such the Court finds it permissible for the defense to inquire in limited fashion about the Victim's prior sexual relationship with [W.C.L. (such dates that it occurred, how long the sexual relationship lasted, etc.) during the cross-examination of the Victim. Pursuant to Rule 608, specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. If, however, the witness denies the conduct, the party proferring the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence. Tenn. R. Evid. 608(b); State v. Shepherd, 862 S.W.2d 557 (Tenn. Crim. App. 1992). That is, while the Court has found the requirements of Rule 608 have been satisfied, and the defense [can] question the Victim about his previous relationship with [W.C.L.], the defense is not able to introduce any extrinsic testimony or evidence as to the issue, including but not limited to the testimony of [W.C.L.] or statements from his forensic interview[ (Ex. 3), the cross-examination of [S.B., the victim's mother,], the testimony of Detective Mick, or the Franklin Police Department record (Ex. 4).

**Direct Appeal and First Petition for Writ of Error Coram Nobis.** On January 9, 2014, the Petitioner appealed his convictions, arguing in part that the trial court had erred in denying his Rule 412 motion. See State v. William Edward Arnold, Jr., No. M2014-00075-CCA-R3-CD, 2015 WL 99272, at *1 (Tenn. Crim. App. Jan. 7, 2015), perm. app. denied (Tenn. May 15, 2015) (designated "Not for Citation"). On October 9,

2014, while this appeal was pending,[6] the Petitioner filed a timely petition for writ of error coram nobis, alleging that the victim during his deposition in the civil case had offered testimony that, in effect, recanted his criminal trial testimony about the timing of his sexual relationship with W.C.L, which the Petitioner claimed amounted to the discovery of new evidence requiring coram nobis relief. Also on October 9, 2014, the Petitioner filed a motion to stay his direct appeal pending the outcome of his coram nobis petition.[7] See id. at *5 n.8.

On October 30, 2014, this court granted the motion to stay. See id. In its order, this court granted the stay after summarizing the issues in the Petitioner's coram nobis petition, stating: "In the petition for writ of error coram nobis, filed in the trial court, [the Petitioner] asserts that [the victim] has 'recently testified, under oath, at a civil deposition, offering testimony which, in effect, recants his testimony from the trial in this case.'" State v. William Edward Arnold, Jr., M2014-00075-CCA-R3-CD (Tenn. Crim. App. Oct. 30, 2014) (order).

On November 20, 2014, the coram nobis court summarily dismissed the petition for the writ, finding that the victim had not recanted any material testimony provided at either the Rule 412 hearing or the criminal trial and that, consequently, there was no newly discovered evidence requiring coram nobis relief. William Edward Arnold, Jr., 2015 WL 99272, at *5 n.8; William Edward Arnold, Jr., M2014-00075-CCA-R3-CD, (Tenn. Crim. App. Jan. 5, 2015) (Motion to Lift Stay of Appellate Proceedings). The Petitioner did not appeal the summary dismissal of his petition for writ of error coram nobis. Id.; William Edward Arnold, Jr., 2015 WL 99272, at *5 n.8.

Thereafter, this court lifted the stay, and on January 7, 2018, affirmed the Petitioner's convictions on direct appeal. In its opinion, this court held that the introduction of the specific instances of any sexual information the victim obtained from his relationship with W.C.L. were "not critical to the issue of whether [the Petitioner] raped the victim" because the relationship with W.C.L. "most likely started in late 2010 after the abuse by [the Petitioner] was reported." William Edward Arnold, Jr., 2015 WL 99272, at *11. It then held that the trial court "struck a balance" by "allowing [the Petitioner] to cross-examine the victim about the consensual sexual relationship he had with W.C.L. without unnecessarily subjecting the victim to an invasion of his sexual privacy." Id. The court also noted that defense counsel admitted during the hearing on this matter that Rule 412(c)(4) did not apply. Id. at *10. On May 15, 2015, the Tennessee Supreme Court denied the Petitioner's application for permission to appeal.

---

[6] Oral argument on the direct appeal occurred on September 9, 2014, and the opinion for this appeal was filed on January 7, 2015.

[7] Although this petition for writ of error coram nobis is not included in the appellate record, other portions of the record indicate that this first coram nobis petition was, in fact, filed.

- 16 -

**Petition for Post-Conviction Relief and Second Coram Nobis Petition.** On May 3, 2016, the Petitioner timely filed a petition for post-conviction relief, alleging (1) that his trial attorneys were ineffective in failing to properly litigate pretrial motions, in failing to adequately and effectively investigate his case, in failing to obtain a defense expert to challenge the proof, in failing to challenge objectionable jury instructions and tender special instructions, in failing to adequately and effectively prepare him to testify, in failing to make appropriate objections to the State's evidence and testimony, and in failing to present a defense and (2) that he was denied his right to due process based on the prosecution's improper comments during closing argument.

On July 3, 2017, the Petitioner filed an untimely second petition for writ of error coram nobis, claiming that the deposition testimony provided by the victim and his mother in the civil case constituted the discovery of new evidence, which, if it had been available at trial, may have resulted in a different outcome. He stated that the victim and the victim's mother acknowledged during these civil depositions that the victim and W.C.L. had a sexual relationship and that the victim had been exposed to homosexual pornography and had knowledge of sexual matters prior to making the allegations of sexual abuse against the Petitioner. The petition also asserted that the victim claimed during the civil deposition that the Petitioner had chest hair and no tattoos, when in reality, the Petitioner had never been able to grow chest hair and had several large tattoos on his left arm and both legs, which indicated that the victim had never seen the Petitioner with his clothing removed. In addition, the petition asserted that the victim during his civil deposition provided a date for the last incident of sexual abuse that was different than the date the victim had provided at trial.

Also on July 3, 2017, the Petitioner filed an amended post-conviction petition, reiterating several issues alleged in the first post-conviction petition and alleging new issues that his trial attorneys were ineffective in failing to file a comprehensive motion for a bill of particulars and to pursue an adequate response from the State, in failing to call W.C.L. at trial, or alternatively, in failing to call Detective Mick and in failing to present the videotape of W.C.L.'s investigation by the Franklin Police Department, in failing to present a defense of lack of opportunity, in failing to object to improper comments by the prosecutor during closing argument, and in failing to ask the victim necessary questions about the Petitioner's body and the tattoos and brands on the Petitioner's body.

On February 20, 2018, the Petitioner filed an amended coram nobis petition, alleging that Dr. Barbara Ziv's report provided new evidence and that had this report been available for trial, it may have resulted in a different outcome. Specifically, the

Petitioner asserted in the petition that the victim admitted to Dr. Ziv that he had not seen W.C.L. since November 2010.

On February 20, 2018, the State filed a response, arguing that the second coram nobis petition should be dismissed without a hearing because it was time-barred, because the Petitioner was not entitled to due process tolling, and because this same claim had been previously determined against the Petitioner in his first petition for the writ. Evidentiary hearings on the Petitioner's coram nobis petitions and post-conviction petitions were held on February 22, 2018, and March 12, 2018.

**February 22, 2018 Hearing.**  Gary Kellar testified that he was an attorney and began representing the Petitioner in 2011 in the civil lawsuit filed by the victim and his mother.  He explained that this civil case had been initiated before the trial in the Petitioner's criminal case involving the victim.  Kellar said he followed the Petitioner's criminal case "very, very closely" because he knew the "the criminal matter would have a significant impact on the civil matter."  He also said that he attended the Petitioner's criminal trial.

As a part of the civil case, he took discovery depositions of the victim and the victim's mother, which resulted in approximately 1500 pages of deposition testimony. The transcripts from these depositions were admitted as exhibits during the post-conviction hearing without objection.  The victim's mother was deposed on July 22, 23, and 24 of 2014, and the victim was deposed August 25 and 26 of 2014 and then on September 13, 2014.  Kellar said that he reviewed the victim's and the victim's mother's testimony from the Petitioner's criminal trial in order to prepare to depose them in the civil case.

Kellar said that during the victim's deposition in the civil case, the victim admitted that he met W.C.L. in the summer of 2009 or 2010, which was wholly inconsistent with the victim's testimony at the Petitioner's criminal trial that he met W.C.L. in 2011, after he disclosed that the Petitioner sexually abused him.  The victim also said that W.C.L. was sixteen years old at the time he first met him.  Kellar noted that at the Petitioner's criminal trial, the victim claimed that the only way he knew about these sexual matters was from the Petitioner, which Kellar did not believe.  As a result, Kellar attempted to establish during the victim's civil deposition that the victim had knowledge of these sexual matters prior to any involvement with the Petitioner.  In particular, Kellar attempted to show that the victim had knowledge of sexual matters based on his viewing of homosexual pornography prior to the time he met the Petitioner.  He said the victim disclosed during the deposition that his mother called him a "f[----]t" when she discovered that he was viewing homosexual pornography on his cell phone or when his mother discovered that he was talking to a guy .  The victim also disclosed that when his

mother discovered that he was writing messages in a chat room, she asked him if anyone had touched him, and the victim initially replied, "No," before telling his mother "William" had abused him.

Kellar said that during this deposition, he asked the victim to provide more details than the victim had disclosed during the Petitioner's criminal trial about the alleged incidents involving the Petitioner. He asked the victim if the Petitioner had chest hair, and the victim replied affirmatively, although Kellar knew that the Petitioner did not have any chest hair. He also asked the victim if the Petitioner had any tattoos, which the victim denied, although Kellar was aware that the Petitioner had "definitive tattoos on his body" that were "easily discernible." Kellar said that during the deposition, the victim disclosed that he began "cutting" himself in March 22, 2011. He also noted that information disclosed during discovery showed that the victim had been exposed to homosexual pornography prior to making the allegations against the Petitioner in November 2010.

Kellar said that during the civil deposition of the victim's mother, she admitted that the victim first met W.C.L. in August 2009 when D.L. moved in with her. Kellar felt that the mother's admission was significant because it indicated that the victim and W.C.L. had likely had sexual contact during the summer of 2009. Kellar noted that the victim's mother had been dating D.L., who was W.C.L.'s older brother, in 2010, which was when the victim made the allegations against the Petitioner. He said the victim's mother admitted during her deposition that W.C.L.'s family had told her that W.C.L. was seventeen years old when he developed a sexual relationship with the victim.

Kellar said that he became aware during his investigation in the Petitioner's civil case that the Franklin Police Department had investigated W.C.L. regarding the victim's allegations that W.C.L. had sexually abused him. He also said that he had seen documentation regarding this investigation.

Kellar said he assisted the Petitioner's criminal defense attorneys by attending client meetings and by providing information he received through the civil discovery process. He acknowledged that the Petitioner's defense attorneys extensively cross-examined the victim and his mother at the criminal trial and agreed that trial counsel was a "zealous advocate" for the Petitioner during her closing argument when she highlighted the multiple inconsistencies in the testimony provided by the victim and the victim's mother. He said trial counsel also asserted during her closing arguments that the victim and the victim's mother had lied about the allegations against the Petitioner and that the victim had acquired his sexual knowledge from W.C.L., rather than the Petitioner.

Kellar stated that the Petitioner's attorneys in the criminal case were limited in their ability to present proof because of the trial court's unfavorable ruling on the Petitioner's Rule 412 motion. However, despite this damaging ruling, Kellar said that the Petitioner's defense attorneys argued to the jury that the victim obtained his sexual knowledge from W.C.L. and not the Petitioner.

Kellar admitted that he was able to delve a lot deeper in the civil case than the Petitioner's attorneys had been able to in the criminal case. The Petitioner was appointed new counsel after he was convicted in the criminal case, who filed the first petition for writ of error coram nobis on the Petitioner's behalf based on the civil depositions of the victim and his mother. He said this coram nobis petition was filed within approximately six weeks of the 2014 civil depositions of the victim and his mother. Kellar recalled that the trial court denied the coram nobis petition. He noted that he was unable to complete the 2014 civil depositions of the victim and his mother because the civil court stopped him and that the court later refused to allow him to take additional depositions of the victim and his mother. Kellar said that the trial in the civil case had not yet occurred, and he was in the process of taking additional deposition testimony from other witnesses and the other defendants in that case. He said there had been no other hearings or proceedings where he had been able to further examine the victim and the victim's mother.

Kellar said he subpoenaed the cell phone records of the victim and W.C.L. because he was attempting to show there was contact between the victim and W.C.L. prior to 2011, which would have contradicted the victim's testimony at the Petitioner's criminal trial. Although he issued subpoenas to the cell phone carriers, he said the process of obtaining cell phone records was "very laborious and very difficult" and "took a while." Ultimately, he was unable to obtain these cell phone records, which "[a]bsolutely devastated" the Petitioner's coram nobis case and resulted in the dismissal of the Petitioner's first petition for writ of coram nobis. Kellar later admitted that he had not seen the Petitioner's first petition for writ of error coram nobis or the court's order dismissing it and, therefore, was not aware that the main ground in the petition was the testimony of the victim and his mother in the civil depositions, which effectively served as a recantation of their testimony at the criminal trial because it was so contrary to the testimony they had provided at the Petitioner's trial. Kellar also acknowledged that because he had not seen the court's order denying coram nobis relief, he was not aware that the court did not mention the absence of the cell phone records between W.C.L. and the victim.

Dr. Barbara Allen Ziv,[8] an expert in forensic psychiatry, testified that she performed a forensic evaluation of the victim on August 14, 2017, at the request of attorney John Anderson, the attorney representing Big Brothers Big Sisters of Middle Tennessee in the civil lawsuit. She stated that the victim was nineteen years old at the time of this interview and that the interview lasted from approximately 8:30 a.m. to 3:00 p.m.. Dr. Ziv stated that she had not been hired by the Petitioner to assist with the post-conviction hearing and that she was not paid for her testimony at this hearing.

Dr. Ziv stated after she was asked to evaluate the victim, she initially assumed that her role would be to assess whether, or if, there were damages because of the Petitioner's sexual abuse of the victim, given that the Petitioner had already been convicted in the criminal trial. However, after reviewing the required documents and evaluating the victim, Dr. Ziv said that it became clear that the victim had sexual contact with W.C.L.. She noted that the victim was very forthcoming regarding his coming to terms with his homosexuality and the fact that his mother, who was volatile and violent, believed that his homosexuality was a sin. Dr. Ziv said that although the victim was forthcoming about his sexual relationships and his sexual contact with W.C.L, the victim's "whole demeanor changed" when he talked about the Petitioner. When she first brought up the Petitioner, the victim said he did not want to talk about the Petitioner, and they talked about the rest of his life history, including his sexual relationship with W.C.L., before they began talking about the Petitioner again. She said the victim began talking about the Petitioner "in a very perfunctory way" and then stopped talking. She said the victim then said, "I wish this hadn't happened" and "I feel guilty."

Dr. Ziv said the victim told her that the last time he talked with W.C.L. was in November 2010, which was significant because November 2010 was when the victim first acknowledged to his mother that "William" had been sexually abusing him. She observed that the Petitioner and W.C.L. both had the first name of "William." When Dr. Ziv asked the victim why he felt guilty, the victim asked to go outside and talk to his lawyer, and when he returned, the victim said that his attorney told him he did not have to talk to her about the Petitioner. Dr. Ziv stated that the change in the victim's demeanor was "so dramatic" that she called John Anderson and told him that she did not believe that the Petitioner was guilty of sexually abusing the victim, even though the Petitioner had been convicted. She said that while none of the things the victim told her about the Petitioner matched the victim's allegations, the victim's account of his sexual interaction with W.C.L., the timing of the victim's breakup with W.C.L. in November 2010, and the victim's tearful confession that he had sex with W.C.L. did match the victim's allegations of sexual abuse. Dr. Ziv noted that when the victim acknowledged to his mother that

---

[8] Although this witness is identified as Dr. "Zib" in the transcript, her report identifies her as Dr. "Ziv," and we will refer to her by this name.

"William" was sexually abusing him, his mother did not ask him to clarify which "William" and just assumed that the "William" he identified was the Petitioner.

Dr. Ziv viewed the following documents in conducting her forensic psychiatric evaluation of the Petitioner: the victim's school records, the victim's voluminous psychiatric records, the 1500 pages of civil deposition testimony from the victim and his mother, the civil deposition testimony from the Petitioner, the testimony from all of the witnesses at the Petitioner's criminal trial, the records concerning the victim's mother's allegation that her father sexually assaulted the victim when the victim was four years old, the police records and police interviews after the victim accused the Petitioner of sexually abusing him, and the records related to the victim's allegations that W.C.L. sexually abused him.

Dr. Ziv said that she repeatedly reviewed the interview of W.C.L. by Detective Mick of the Franklin Police Department regarding W.C.L.'s sexual contact with the victim. During this interview, W.C.L. admitted that in 2010, he was having a sexual relationship with the victim. Dr. Ziv stated that the criminal investigation into W.C.L. by the Franklin Police Department began when the victim told his therapist that he had a sexual relationship with W.C.L., and the therapist was required to report this relationship to the police. During the Franklin Police Department's investigation, the victim and W.C.L. were interviewed, but W.C.L. was not prosecuted because the victim's mother did not wish to prosecute him. Dr. Ziv stated that no one connected the Franklin case against W.C.L. with the criminal case against the Petitioner. She said that the sexual interactions the victim told to detectives in Franklin about W.C.L. were the same sexual interactions for which the victim accused the Petitioner. She noted that because the Franklin case against W.C.L. was never connected to the Petitioner's criminal case, the officers investigating the allegations against the Petitioner just assumed that all of the victim's knowledge of sexual matters came from the Petitioner because they did not have a "competing source of that information."

She stated that the victim's psychiatric records and forensic interviews made it clear that no one ever confronted the victim about his "ever-changing stories" about what happened with the Petitioner or ever referenced the fact that the victim had oral sex, fondling, and anal sex with W.C.L. from the summer of 2010 to November 2010.

Dr. Ziv said that the victim was very familiar with sexual acts at a very young age. She said that there was an incident in kindergarten when the victim touched the penis of another boy in class. The victim also told Dr. Ziv about occasions in grade school when he and another boy would "surreptitiously rub each other's genitals over each other's clothes until they got caught." Dr. Ziv said the victim's mother admitted to a psychiatrist that the victim had been viewing pornography since he was ten years old. During Dr.

Ziv's interview with the victim, the victim disclosed that he knew he was homosexual from a very young age and struggled with this knowledge because his mother believed homosexuality was a sin. She explained that the victim's psychiatric records showed that the victim's mother kicked the victim out of her house several times because of the victim's homosexuality. She said that over time, the victim began to "distance himself a little bit from his mother's reactions" to his sexuality, and that at that point in time, the victim's hospitalizations stopped and the victim stopped cutting himself and stopped having suicidal thoughts.

Dr. Ziv's report was admitted as an exhibit to the hearing. Dr. Ziv opined that the victim was referring to W.C.L., not the Petitioner, when his mother confronted him about his homosexuality in November 2010 and that neither his mother nor anyone else investigated which "William" the victim had identified during this confrontation. She noted that the victim's mother was "violent" and "emotionally abusive" toward the victim and that W.C.L.'s brother D.L. was the victim's mother's boyfriend. While she said that the victim was "sexually mature," he was not "worldly" and would have had a hard time clarifying to his mother that W.C.L. was the "William" he identified as his sexual abuser rather than the Petitioner.

Dr. Ziv stated that one of the main reasons children make a false report of sexual abuse is a "fear of consequences." She noted that the victim was "between a rock and a hard place" because if he admitted that he was talking about W.C.L., then he would have some degree of culpability in his mother's eyes. Dr. Ziv said that the victim, as a twelve-year-old boy, was in a difficult situation and that his mother made an assumption that the "William" he identified was the Petitioner, rather than W.C.L., and that no one else ever asked if there was another William or if there was another way for the victim to have acquired this sexual knowledge. Dr. Ziv stated that "[m]ost importantly," no one ever confronted the victim about his "changing stories with respect to [the Petitioner]." She asserted that the victim never told "the same story twice," which was "the hallmark of a non-credible witness."

Dr. Ziv stated, "[A]s somebody who has reviewed over a thousand convicted sex offenders, . . . I can say that [the Petitioner's] behavior in no way, shape or form conforms to the patterns of behavior of a child molester or a pedophile, even in [the victim's] accounting." She explained that ninety percent of children who are sexually assaulted are sexually assaulted by someone that they know and trust and there is a grooming process for the victim that evolves over time. However, she said that with the Petitioner, there was the "complete absence of the whole grooming process." She asserted that in the time period during which this alleged sexual abuse was occurring, the Petitioner and his wife had just adopted a baby, and the baby was with him every time the victim claimed the Petitioner had sexual contact with him. Dr. Ziv stated that although

the Petitioner could have started spending more time with the victim after the victim's mother asked for his help when the victim broke a girls' game system and wrote some pornography on a garage door, the Petitioner continued to see the victim only through the formalized Big Brothers Big Sisters Program where he saw the victim only a couple of hours twice a month. Consequently, Dr. Ziv opined that the Petitioner's "pattern of behavior [wa]s completely inconsistent with the patterns of behavior of a child molester or a pedophile."

Dr. Ziv acknowledged that she was not licensed in Tennessee and had never testified in Tennessee. She also acknowledged that while she concluded that the victim had lied about the Petitioner's sexual abuse of him, another forensic psychiatrist could review the same information and reach a different conclusion regarding the victim's honesty about his allegations against the Petitioner. Nevertheless, Dr. Ziv insisted, "It would be very challenging to review the volume of materials that I reviewed and . . . come up with a different opinion[.]"

Dr. Ziv admitted that she had never met the victim's mother, although she had reviewed the statements made by the victim's mother during the in-home service visits, during her communications with the victim's school, and during her interviews with the victim's therapist. She asserted that she "had [the victim's mother's] words over the course of years." Dr. Ziv stated that based on her review of the documentation in the psychiatric records over a period of years, the victim's mother was "physically and verbally abusive" to the victim. She specifically noted that the victim's mother had called him a "f[----]t," that the victim's mother had said that she wished she had two of the victim's brother rather than the victim, and that the victim's mother had refused to take the victim to the hospital after he took an overdose of drugs.

Dr. Ziv admitted that other than the victim, she had not spoken with any other individuals, including witnesses and services providers, who were involved in this case. She stated that she had reviewed W.C.L.'s testimony at the Rule 412 hearing, even though it was not listed in her report. Because she never interviewed W.C.L., Dr. Ziv declined to say whether W.C.L. was credible. She did say that she would not take what W.C.L. said about his sexual interactions with the victim "as gospel."

Dr. Ziv opined that the Petitioner did not sexually abuse the victim. Although Dr. Ziv reviewed the transcripts from the Petitioner's criminal trial in order to prepare for the victim's forensic evaluation, she did not recall that the mother's inability to accept the victim's homosexuality was explored during the defense's cross-examination of the victim and his mother. However, she acknowledged if the transcript showed that this issue had been explored, she did not dispute it. Dr. Ziv admitted that she had not reviewed the closing arguments from the criminal trial, wherein defense counsel had

allegedly argued that the reason the Petitioner was identified as the perpetrator was because the victim was scared of his abusive mother. Dr. Ziv stated that she read the testimony provided by the twelve witnesses at trial, including the victim, his mother, and the Petitioner. She also said that she read W.C.L.'s testimony from the hearing on the Rule 412 motion.

Dr. Ziv reiterated that the Petitioner's behavior was not that of a pedophile or child molester. She said that in her "20-plus years" of experience, she had never seen a pattern of sexual assault consistent with the Petitioner's described behavior during the relevant time period. Dr. Ziv acknowledged that she could not say that the Petitioner's sexual assault of the victim did not happen.

The Petitioner testified that he retained trial counsel and his other criminal defense attorney to defend him in his criminal case. The Petitioner said he worked with his criminal defense attorneys and understood that the defense theory was that W.C.L., who also had the first name of "William," was the individual who had sexual relations with the victim and that the Petitioner had not sexually abused the victim because of his excellent character.

The Petitioner said he attended the Rule 412 hearing and heard the testimony from the victim, W.C.L., and W.C.L.'s brother, D.L.. He said the purpose of the Rule 412 hearing was to ask that the defense be allowed to introduce evidence at trial showing that there was a preexisting relationship between the victim and W.C.L. and that when the victim identified "William" as his sexual abuser in November 2010, he was referring to W.C.L. and not the Petitioner. He said that the primary evidence his defense attorneys wanted to introduce was the Franklin Police Department's videotape of the interview with W.C.L.. The Petitioner said that he was allowed to review this videotape with his criminal defense attorneys in camera and that he was later given a copy of this videotape prior to the Rule 412 hearing.

The Petitioner said that during the Rule 412 hearing, D.L., the victim, and W.C.L. testified. The victim testified that he met W.C.L. in 2011 and that he had a sexual relationship with W.C.L. in 2011. The Petitioner said that during this hearing his defense attorneys never allowed him to testify. He also said that his attorneys never presented any proof, other than from D.L., the victim, and W.C.L., to show that there was a sexual relationship between W.C.L. and the victim around the time that the victim accused the Petitioner of sexual abuse. The Petitioner said that in light of this limited evidence, the trial court concluded that there was not enough proof for an exception to Rule 412. He also said that despite the adverse ruling at the Rule 412 hearing, his defense attorneys did not change their strategy at trial. While he acknowledged that his attorneys were able to ask the victim at trial about whether he had a sexual relationship with W.C.L., he said the

defense was "stuck" with the victim's answer that he had first met and had a sexual relationship with W.C.L. in 2011. He said his attorneys were precluded from establishing that that the victim had been dishonest about the timing of his relationship with W.C.L. because they were bound by the trial court's ruling at the Rule 412 hearing.

The Petitioner explained that there were two types of mentors through the Big Brothers Big Sisters Program—site-based mentors, who go to an after-school program once a week and community-based mentors, who are allowed the pick up the child and take them to community-related events. The Petitioner said that although he started off as a site-based mentor for the victim, he began doing the community-based mentoring of the victim on January 12, 2009, and then stopped having any contact with the victim on June 29, 2010.

The Petitioner said he had prepared a chronological summary of his meetings with the victim based on the information contained in the calendar in his Blackberry and that his summary highlighted the limited amount of time he had spent with the victim. He then detailed a series of events that he attended at the victim's school, the victim's home, a science museum, a high school, a college, and an ice skating event sponsored by the Big Brothers Big Sisters organization. He also said that there were three or four weeks that he did not see the victim because the victim was very ill and several weeks that he did not see the victim because the victim had a broken arm. The Petitioner also explained that he and his wife were placed with a newborn who they brought home on October 5, 2009, which prevented him from seeing the victim the month of October. The Petitioner said that between October and November 2009, his wife was home with the baby, and the victim might have come to his home twice. He said the victim did not come to his home in December 2009, and in January 2010, he would pick up the baby and then visit with the victim.

The Petitioner said that in February 2010, his marriage became strained, and the victim never visited his home again. He said that in May, he informed the victim's mother that he was getting a divorce and that he would be unable to see the victim as often. He also told the victim's mother about a golf program that he thought would be a good fit for the victim, which took place on Tuesdays in June 2010. He said that on two of these Tuesdays, he picked up the victim, and the remaining two Tuesdays, a fraternity brother picked up the victim and took him to this program. At the end of each of these golf programs, the victim's mother picked up the victim. The Petitioner's summary of his meetings with the victim was admitted into evidence. He said that his defense attorneys were aware that he had this summary that detailed his lack of opportunity to abuse the victim.

- 26 -

The Petitioner said that his defense attorneys never talked to him about the different ways to defend allegations of child sexual abuse. He said that his attorneys never discussed the possibility of presenting a defense of lack of opportunity or alibi. The Petitioner said that he now realized that no evidence was permitted to be introduced regarding the "wrong William" being identified by the victim and that anything related to this issue was limited to mere argument by his attorneys. The Petitioner also said that his attorneys never talked to him about responding to the State's bill of particulars.

The Petitioner said that he compared his summary with records from Big Brothers Big Sisters and that his summary and the records from that organization were fairly consistent. Although his attorneys were aware of the information contained in his summary, it was not admitted at trial. However, he acknowledged that the records of his meetings with the victim from the Big Brothers Big Sisters organization were admitted into evidence.

The Petitioner said he was aware of the issues Kellar, his attorney in the civil case, developed during the victim's civil deposition, including the victim's claim that the Petitioner had chest hair and did not have any tattoos. The Petitioner explained that he did not have hair on his chest because he had never been able to grow hair there. He also stated that he had a brand on his left arm that was outlined with a tattoo that had the numbers "one nine zero six" above it, that he had a tattoo of the continent of Africa with his parents' initials inside it on his left calf with the numbers "nine zero one" below it, and that he had another brand of an "A" on his right calf. The Petitioner displayed his tattoos to the court. Photographs of the Petitioner's tattoos were admitted as a late-filed exhibit to the hearing.

The Petitioner maintained that his defense attorneys were ineffective in failing to call D.L. to testify at trial because D.L. had testified at the Rule 412 hearing that in December 2010, he told the Metropolitan Nashville Police Department that his younger brother, W.C.L., had had sexual relations with the victim. The Petitioner said that although he had told his criminal defense attorneys to subpoena D.L., he was never subpoenaed to testify at trial. The Petitioner also said it was ineffective for his defense attorneys not to call W.C.L. to testify at trial because W.C.L. had told the Franklin Police Department during his recorded interview that he had broken up with the victim before Thanksgiving 2010.

The Petitioner also said it was ineffective for his defense attorneys not to call Detective Tamara Mick, an officer with the Franklin Police Department, and Cynthia Hastings, a DCS caseworker who was present during one of the interviews conducted by the Franklin Police Department.

- 27 -

The Petitioner said he had wanted to obtain the cell phone records belonging to the victim and W.C.L. after he learned that W.C.L. disclosed to the Franklin Police Department that the victim had sent him a text message asking him to send a photograph of his penis. The Petitioner later learned during the civil depositions that the victim and W.C.L. had been communicating via cell phone before they ended their relationship prior to Thanksgiving 2010. The Petitioner said that when he asked his criminal defense attorneys to obtain these cell phone records, they told him there was insufficient time in which to get them. He said that these cell phone records "can't be retrieved" now because the relevant cell phone companies only kept these records "for a certain amount of time." The Petitioner added, "[b]y the time [Kellar] asked for them [in the civil case], we were unable to get them."

The Petitioner asserted that there was no forensic or physical evidence that incriminated him. He acknowledged that there was a controlled telephone conversation but asserted that he had not confessed to sexually abusing the victim during that call. Consequently, the Petitioner asserted that the evidence in his case came down to the victim's testimony against his own testimony.

The Petitioner acknowledged that Kellar, his attorney in the civil case, assisted his criminal defense attorneys by working with them and providing them information. He said he met with his criminal defense attorneys two or three times a month and believed at the time that they "were doing the right thing" in order to effectively defend him. However, after the Rule 412 hearing, the Petitioner recalled telling his criminal defense attorneys, "We got our a[--]es kicked. We've got to do better." Nevertheless, the Petitioner said he kept his criminal defense attorneys and continued to give them information.

The Petitioner said he did not recall reviewing the State's evidence with his attorneys prior to trial and did not know what the victim's testimony would be until he testified at the Petitioner's trial. He said that he had watched the victim's forensic interview conducted by Nashville Children's Alliance but that the victim never mentioned that he first made the allegations against the Petitioner when the victim was caught by his mother talking to a boy on the internet about the sexual contact the victim and this boy had earlier that day.

The Petitioner acknowledged that when the victim testified at trial that he had made the allegations against the Petitioner when his mother caught him talking to a boy on the internet regarding their sexual contact, his defense attorneys cross-examined the victim about this. However, the Petitioner denied that his attorneys vigorously cross-examined the victim about this issue. He also said that while his defense attorneys cross-examined the victim's mother, he claimed they did not vigorously cross-examine her at

his trial. The Petitioner acknowledged that his attorneys were able to get the victim's mother to admit during her trial testimony that she had lied in the past about this case.

The Petitioner stated that during trial, he testified in own defense and presented his father and his friend to testify regarding his good character. He said he also presented evidence regarding his education and the organizations with which he was involved as well as proof that he did not commit these offenses and that another "William" was responsible. The Petitioner reiterated that there was never any proof presented at trial showing the sexual relationship between W.C.L. and the victim around the time of the allegations against him. He said that trial counsel conducted the closing argument for the defense. The Petitioner said that although he reviewed the transcript of trial counsel's closing argument, he did not recall her emphasizing the inconsistencies in the victim's and his mother's testimony.

The Petitioner said that upon reflection, he believed his defense should have emphasized the limited amount of time he spent with the victim as a part of the Big Brothers Big Sisters Program. He stated that if one compared his summary with the victim's time frame regarding the abuse, it would have been clear that he could not have sexually abused the victim.

Trial counsel testified that she was retained by the Petitioner during the police investigation and prior to the Petitioner's indictment. She represented the Petitioner throughout the criminal trial and through the motion for new trial. Trial counsel said that the other attorney representing the Petitioner in the criminal case was retained before her and that they represented the Petitioner together.

Trial counsel stated that she filed for discovery and "eventually got what the Court allowed us to get." She also said the defense filed for a bill of particulars and then filed a motion to compel a more specific bill of particulars. In addition, the defense filed subpoenas to obtain the victim's medical information, hospital records, police reports, school records, and records from Big Brothers Big Sisters and then filed motions to view all of those documents because they were filed under seal. Trial counsel said that there were some documents to which the defense never got access.

Trial counsel noted that because numerous documents were filed under seal, the defense was not given copies of these documents and could only review them under the supervision of the court clerk. She said she and the other criminal defense attorney reviewed the hundreds of pages of documents in the clerk's office and took notes so they could explain them to the Petitioner during their meetings. Trial counsel gave the Petitioner a DVD copy of the victim's forensic interview with the Nashville Children's Alliance, and the Petitioner, who was released on bond, was able to view this interview

on his personal computer. The Petitioner was also able to review documents obtained during discovery. Trial counsel said she and the other criminal defense attorney, as well as Kellar, who was retained by the Petitioner in the civil case, met at the Petitioner's convenience and often set aside entire days to work together on the Petitioner's case.

Trial counsel said the defense filed a Rule 412 motion, and the other criminal defense attorney retained by the Petitioner examined the victim and W.C.L. at the Rule 412 hearing. She said the defense never had access to the victim or his mother prior to the Rule 412 hearing but did get access to W.C.L. prior to the Rule 412 hearing after having him served with a subpoena.

Trial counsel said that she believed they were ready for trial because they had received all the information to which they had been granted access by the court. When she first met the Petitioner and reviewed the allegations against him, she believed, based on her thirty years' experience as a "[p]rosecutor with [a] county . . . in Chicago," a federal prosecutor, and an attorney in private practice that the Petitioner had been falsely accused. As a result, she began looking for proof of the false accusations. Trial counsel said she was never given anything except broad charges, despite her efforts to obtain a more specific description of the relevant dates through a bill of particulars. She stated that everyone, including the Petitioner, knew that the State had no forensic evidence against him. Trial counsel acknowledged that the defense was that the Petitioner did not commit these offenses. She said they also presented evidence of the Petitioner's good character, even though she knew that good character was not a defense to sexual assault. Trial counsel asserted that they could have "packed the courtroom with character witnesses" but that they were limited by the wishes of the Petitioner and by the court. She said that the Petitioner chose his character witnesses and that he could have chosen to have more than two character witnesses testify on his behalf.

Trial counsel asserted that the Petitioner's case was always going to be difficult to defend because they never had access to the victim and because the victim's mother was "hostile." She acknowledged the defense had an easier time getting access to W.C.L.. She said W.C.L. was subpoenaed and appeared at the Rule 412 hearing, and the trial court allowed the defense to talk to W.C.L. briefly prior to this hearing because they had never talked to him before. During their short meeting, W.C.L. admitted to the defense that he and the victim had a sexual relationship and gave them a timeframe for the relationship. However, during the Rule 412 hearing, W.C.L. became evasive when asked whether he and the victim had sex and claimed that he was on drugs and could not remember what happened. Trial counsel said that at the conclusion of the Rule 412 hearing, the court ruled that the defense could not present any evidence of the victim's past sexual experiences with W.C.L. at trial unless the victim denied having a sexual

relationship with W.C.L.. Despite the trial court's unfavorable Rule 412 ruling, trial counsel still argued in her closing that W.C.L. was the perpetrator in the case.

Trial counsel said she first learned about W.C.L. during her investigation and not from the Petitioner. The defense prepared the Petitioner to testify that he did not sexually assault the victim, but they were unable to prepare an alibi defense because the State never provided any definite dates as to when the abuse allegedly occurred. Trial counsel noted that although the victim claimed the abuse happened a few times, the victim was only ever able to give one definitive date that the abuse occurred, and the defense disproved that date. She also said that while the Petitioner gave the defense his summary of the time he spent with the Petitioner, "it wasn't enough to cover this one little time." She asserted that the trial court acquitted the Petitioner of some of the charges against him because they were "just so blatantly wrong."

Trial counsel stated that the defense did not call D.L., W.C.L.'s brother, because he would have been only able to testify about W.C.L.'s sexual relationship with the victim, which the defense was precluded from presenting based on the court's Rule 412 ruling. She said she did not recall D.L. ever admitting that W.C.L. and the victim had a sexual relationship until the Franklin Police Department began investigating the allegations that W.C.L. had sexually abused the victim.

Trial counsel said the defense attempted to subpoena Detective Tamara Mick of the Franklin Police Department for trial. However, she said that Detective Mick's testimony would have been about the investigation into allegations that W.C.L. sexually abused the victim, which was "off-limits" pursuant to the Rule 412 hearing.

Trial counsel stated that she did not recall anything about Cynthia Hastings, other than that Hastings may have been in the room when the victim or W.C.L. was being interviewed by the Franklin Police Department. She noted that Hastings could not have been called to testify because anything related to the Franklin Police Department's investigation was precluded by the court's Rule 412 ruling unless the victim denied having a sexual relationship with W.C.L., which he did not do.

Trial counsel said that she gave a passionate closing argument at trial because she believed the Petitioner was not guilty. Following trial, the defense filed a motion for new trial and another motion for judgment of acquittal.

Trial counsel said that the defense did everything that they could to get a favorable result at the Petitioner's trial and that they challenged the Rule 412 ruling because they knew that the victim's allegations were based "in his background, in his family, in his environment." They also knew as early as pre-kindergarten that the Petitioner was

"sexually acting out," but they were precluded from presenting this evidence because of the court's Rule 412 ruling.

Trial counsel noted that the defense was unable to do the civil depositions prior to trial because it was hindered by the judge's rulings in the civil case. She noted that because the civil case started so much earlier than the criminal case, they hoped that the discovery and depositions in the civil case would be completed prior to the criminal trial. However, this ultimately did not occur because the judge in the civil case stayed the entire civil action until the criminal case was over. She stated, "I think it would have been a more positive outcome [in the Petitioner's criminal trial] if the jury had heard who [the victim] and his mother were, what their history was. But we did not have it."

Trial counsel stated that Dr. Ziv had access to over thirty documents, but during the Petitioner's criminal trial, the defense was unable to use this information because of the rulings by the trial court in the criminal case and the rulings of the judge in the civil case. She said that she and the other criminal defense attorney were not allowed to present any evidence that W.C.L. was the person responsible for the crimes against the victim.

Trial counsel said the defense filed a Rule 412 motion to be allowed to introduce evidence regarding the sexual relationship between the victim and W.C.L.. At the Rule 412 hearing, the victim denied that he had a sexual relationship with W.C.L. in 2010, the victim's mother was evasive about whether such a relationship existed, and W.C.L. claimed that he could not remember what happened because he was on drugs. Trial counsel asserted that the trial court was left with a record that did not show that there was a viable defense under the constitution that would require an exception to Rule 412. She also said there were issues obtaining some of the records for the Rule 412 hearing. She asserted that they had "to get a subpoena for everything" and that the subpoenaed records were placed under seal, which necessitated motions to be able to view them and appointments to review the records under the supervision of the clerk.

When trial counsel was asked whether the defense renewed the Rule 412 motion when they obtained these records, trial counsel replied, "We didn't renew the motion. We filed—I don't know if it was a renewal. We went back—I believe we went back to court on the second time on the motion." She added, "[W]e never had access that we could use any records." Trial counsel explained that the defense first discovered the Franklin Police Department's investigation into allegations that W.C.L. sexually assaulted the victim when they subpoenaed the "Cumberland DHS" records . After learning of these records, she spoke to a detective in Franklin about the substance of their records, but this detective refused to provide these records to her without a subpoena. Later, Kellar was able to subpoena the Franklin Police Department to obtain these

records. Trial counsel acknowledged that if the defense had been able to present the records given to Dr. Ziv and Kellar, the outcome of the Rule 412 hearing and the trial might have been different.

At the conclusion of the post-conviction hearing, the State informed the court that the Petitioner's other criminal defense attorney would not testify as a witness because he and trial counsel worked side-by-side as co-counsel and he did not believe he could provide "anything different or additional" to what trial counsel had offered. The State then rested its case.

**March 12, 2018 Evidentiary Hearing.** At the beginning of this hearing, the State objected to the Petitioner calling Donald Dawson to testify because the Petitioner's stand-alone issue of prosecutorial misconduct during closing arguments had been waived for failure to raise it on direct appeal. The post-conviction court ruled that while it understood the State's objection and was familiar with the relevant case law, it would allow Dawson to testify on this issue.

Donald Dawson, the Post-Conviction Defender for the State of Tennessee from 1996-2012, was accepted as an expert. He testified that in order to evaluate the prosecutor's closing arguments for the purpose of this post-conviction hearing, he had reviewed the transcript of the closing arguments, a video recording of the closing arguments, a video recording of the Petitioner's trial testimony, and the trial court's December 3, 2012 order releasing certain documents that had been under seal to counsel for both parties. He also reviewed the applicable case law and the American Bar Association (ABA) standards for closing arguments.

Dawson stated that he examined the December 3, 2012 order because he was concerned, after reviewing the closing arguments, about what the prosecutor would have known or should have known after reviewing the documents referenced in the order, particularly the Franklin Police Department's report detailing the allegations that W.C.L. sexually abused the victim. He said that the trial court's December 3, 2012 order made it clear that the Franklin Police Department report was provided to both the prosecution and the defense.

After reviewing the aforementioned documents and video recordings, Dawson prepared a two-column report for the purpose of evaluating the prosecutor's closing arguments in light of the ABA Standards, which was admitted into evidence. He then identified the following five comments to which the Petitioner's trial attorneys, in his opinion, should have objected: (1) when the prosecutor sat in the witness stand during closing argument and mocked the Petitioner; (2) when the prosecutor characterized the Petitioner as a wolf in sheep's clothing; (3) when the prosecutor improperly bolstered the

credibility of the victim by saying that the victim had been "honest"; (4) when the prosecutor injected issues broader than guilt or innocence of the accused by insinuating that they jury could heal the victim with their verdict; and (5) when the prosecutor drew incorrect inferences from the evidence when she suggested to the jury that there was no other way for a twelve-year-old boy to know about these sexual matters other than from the Petitioner, even though she knew that evidence existed showing that the victim and W.C.L. had sexual contact in 2010.

Dawson acknowledged that the defense objected to the prosecutor's comment that referenced a fact not in evidence, and when the trial court confirmed that the fact had not been presented as evidence, the prosecutor repeated the fact again. He also noted that the defense objected a second time when the prosecutor referenced the Petitioner's participation in a mentoring program that he had not participated in for the last three years of the relevant period. When the trial court sustained that objection, the prosecutor said that she was going to leave that issue for the jury. Dawson said the defense never attempted to strike the prosecutor's comment about leaving it to the jury. He also thought it was "surprising" that trial counsel did not object to all the statements made by the prosecutor in closing that Dawson believed were objectionable.

Dawson said the prosecutor erred in suggesting to the jury that the victim could have acquired his sexual knowledge only from the Petitioner when the prosecutor knew that there were documents and a recording showing that the victim and W.C.L. had sexual contact before the victim made the allegations against the Petitioner. Citing Berger v. United States, 295 U.S. 78, 88 (1935), the ABA Standards, and the rules of professional conduct, Dawson asserted that a prosecutor is not permitted to ask the jury to draw an inference that the prosecutor knows is not supported by the evidence. He said that under these circumstances, it was defense counsels' obligation to object and to ask for a mistrial when the prosecutor made an argument designed to have the jury draw an inference that was not supported by the record. Dawson also noted that the Petitioner's attorneys should have renewed their Rule 412 motion prior to trial so that the prosecutors would have been precluded from drawing this inference at the Petitioner's trial.

Dawson acknowledged it was possible that another lawyer could look at the information he reviewed and disagree with his evaluation of the objectionable portions of the prosecutor's closing arguments. However, he asserted that "[they p]robably wouldn't totally disagree[.]" He acknowledged that he did not personally know the prosecutors on the Petitioner's case and had never spoken to them.

Dawson disagreed that the defense might have chosen not to object to the prosecution's erroneous inferences for a tactical reason, such as not drawing further attention to the statement. He concluded that it was unreasonable for the defense not to

object and ask for a mistrial because the prosecution's objectionable statements went "on and on and on." He also said that it was clear that the defense recognized that the prosecutor's comments were a problem because at the beginning of the defense's closing, trial counsel remarked that this was not "Saturday Night Live" when referencing the prosecutor's comments. Dawson said that it was not reasonable for the Petitioner's attorneys to believe that their closing was so strong that they did not have to object and ask for a mistrial when the prosecutor suggested that the twelve-year-old victim could have only acquired his sexual knowledge from the Petitioner. He noted that the prosecutor's assertion that there was no other way for the victim to have this sexual knowledge unless he had been abused by the Petitioner was an extremely powerful argument that would have "just resonate[d]" with a juror who had not yet made up his or her mind about the case. Specifically, Dawson noted,

> [T]he fact that [the defense attorneys] didn't get up and say, objection, Your Honor . . . And again, that they don't try to say, you know, Your Honor, there was a [Rule] 412 hearing [with a predecessor judge], we couldn't put this in, but it's here. The prosecution knows it. We know it. It's an improper inference. We move for a mistrial. I mean, at some point, you've got to stop it and not just let it go.

Dawson admitted that he did not know what the defense was thinking or why they did not object more during the prosecution's closing arguments; however, he insisted that "any qualified or reasonable defense attorney would have objected" to these comments. Dawson also asserted that in all his years of experience, he had never seen a prosecutor sit in the witness chair and mock the defendant during closing arguments. He asserted that the way the prosecutor moved while in the witness chair was objectionable:

> The head movements, the eye movements. I mean, . . . it was clear that she was trying to make the jury see things that, from the testimony that I saw of [the Petitioner], were nothing more than any witness in this situation might experience, and making the jury think that somehow these things indicate that he has a dismissing attitude towards this whole thing, that he's pretending, again, to be something that he's not. And when you put those things together, . . . this is just a violation of the rules.

At the conclusion of the hearing and after hearing arguments from counsel, the post-conviction court stated that it was going to review its notes and then issue a written order. On March 21, 2018, the post-conviction court[9] entered an order denying both the petition for writ of error coram nobis and the petition for post-conviction relief. With regard to the Petitioner's request for coram nobis relief, the court made the following findings of fact and conclusions of law:

> The new evidence at issue in the instant petition involves the sworn testimony of [the victim] and his mother, [S.B.], in a contemporaneously filed and related civil case. It is believed by the Defendant that the sworn testimony contained in the civil case is inconsistent with that which was elicited at the criminal trial.
>
> Specifically, the sworn deposition testimony of [the victim] in the civil case is allegedly inconsistent with his criminal court trial testimony regarding the relevant time period of his prior sexual relationship with [W.C.L.]. Furthermore, the deposition testimony of [the victim's] mother, [S.B.], elicited varied answers regarding her perception of her son's awareness of sexual acts and the timing of [the victim's] relationship with [W.C.L.].
>
> That information had already been ruled inadmissible during Judge Blackburn's Rule 412 hearing.
>
> . . . .
>
> In this case, the judgment of the trial court was entered on November 12, 2013. The order of the court became final on December 12, 2013. The statute of limitations began to run that day and expired one year later on December 12, 2014. This second petition for Writ of Error Coram Nobis was first filed on July 3, 2017 and amended on February 20, 2018—31 months and 38 [days] past the one[-]year deadline respectively.
>
> The inquiry, however, does not end there. Pursuant to Harris, the court may take due process into consideration when the petition is based on newly discovered evidence of actual innocence. 301 S.W.3d at 145 (emphasis added).

---

[9] Although we generally identify the lower court in coram nobis cases as the "trial court," we will refer to the lower court as the "post-conviction court" in this opinion because the Petitioner's case involves both post-conviction and error coram nobis issues.

These considerations stand for the principle that litigants must be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner. Due process considerations that may toll the one[-]year statute require a mixture of law and fact.

. . . .

The Court recognizes that the Defendant has a high burden to demonstrate "newly discovered evidence of actual innocence." Harris at 145. It is the Court's opinion that the Defendant failed to meet this burden. While some of the evidence presented at this post-trial hearing could be considered newly discovered, none of the evidence presented would properly demonstrate actual innocence.

Harris v. State sets out factors a court should consider in determining the timeliness of a writ of error coram nobis, which the Court will now analyze. The first factor is for the court to determine when the statute of limitations would normally have begun to run. As previously stated, the trial court's judgment became final on December 12, 2013. The one[-]year statute of limitations period began that day and expired one year later on December 12, 2014.

Next, the court should determine whether the grounds for relief arose after the limitations period would have commenced. In the writ of error coram nobis, the Defendant states that particular depositions testimony was elicited from [the victim] and his mother, [S.B.], on August 25, 2014 and July 22, 2014 respectively. See Defendant's Amended Second Petition for Writ of Error Coram Nobis at 3, filed Feb. 20, 2018. It is alleged that the deposition testimony was inconsistent and contradictory to that from the criminal court trial. The Court acknowledges that these grounds for relief arose during the one[-]year limitations period. The Defendant also discusses a forensic psych[iatrist]'s evaluation of [the victim], which occurred on August 14, 2017. That evaluation occurred well outside of the limitations period.

Finally, a court should determine if excluding those "later-arising" grounds would deny the Defendant a reasonable opportunity to present his claim.

. . . .

The allegations contained within the writ of error coram nobis are substantially governed by Judge Blackburn's previous Rule 412 [ruling]. It was the ruling of the court that, unless [the victim] <u>denied</u> an existing sexual relationship with W.C.L., the substantial inquiry into that line of questioning would be prohibited. It would, therefore, require a complete denial of [the victim] during sworn testimony to open the door to that line of questioning.

The Defendant refers to the testimony of the forensic psychiatrist Dr. Barbara Ziv as a source of significant doubt as to the validity of the conviction. The entirety of the report prepared by Dr. Ziv is attached to the Defendant's amended petition. The petition does not take into account that discovery in civil cases and in criminal cases is vastly different. A plaintiff in a civil matter is subject to all discovery "reasonably calculated to lead to the discovery of admissible evidence." Tenn. R. Civ. P. 26.02. The forensic exam of [the victim] was prepared for the related civil case. In order for a defendant in a criminal case to have a similar forensic exam of a victim, that defendant is required to establish "the most compelling of reasons" for such an exam. <u>State v. Gibson</u>, 973 S.W.2d 231, 245 (Tenn. Crim. App. 1997). Compelling reasons would include doubt of the victim's sanity or prior mental disorders. Even in such situations, a court should consider ordering an examination "only if there is little or no corroboration to support the charge [of sexual abuse]." <u>Id.</u>

The Court finds the forensic psychiatrist's report prepared by Dr. Barbara Ziv was produced well after the statute of limitations had run and does not provide evidence of actual innocence. Excluding the report would not deny the Defendant a reasonable opportunity to present his claim. The report itself is not evidence of actual innocence. Had it been available at trial, it would have been part of the jury's weighing of the credibility of the several witnesses who testified at trial. The Defendant has not demonstrated that there may have been a different result if the testimony by Dr. Ziv had been part of the Defendant's evidence at the criminal trial.

Accordingly, the Defendant has not met his burden of showing that "such [new] evidence may have resulted in a different judgment, had it been presented at the trial." T[enn.] C[ode] A[nn]. § 40-26-105. The Court respectfully denies the writ of error coram nobis.

As relevant to the Petitioner's request for post-conviction relief, the court made the following findings and conclusions:

The Defendant has the burden of proving by clear and convincing evidence that his counsel's errors were so serious that he was deprived a fair trial. No witness testified about or presented evidence of [the Petitioner's] attorneys' serious errors in their representation. [The Petitioner] presented no expert witness in the field of criminal defense to testify as to the standard of representation in criminal defense work. The witnesses presented by [the Petitioner] frequently spoke of his trial attorneys in a favorable manner: [The Petitioner's] attorneys argued vigorously, in preparing for trial the attorneys accommodated [the Petitioner's] limited schedule, and endeavored to present additional defenses following Judge Blackburn's Rule 412 order.

The Court is required to "eliminate the distorting effects of hindsight and evaluate the conduct from the perspective at the time." Marr v. State, 2001 WL 844401 (Tenn. Ct. App. July 26, 2001) (citing Strickland at 689)). It appears to the Court that [the Petitioner's] trial attorneys found themselves in a situation where a previous evidentiary ruling prohibited what they hoped would be their primary defense. They were required to change their trial tactics and persevere. If one particular defense strategy was ultimately unsuccessful, it does not, on its own, definitively show unreasonable or ineffective representation. See Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). A court defers to strategic and tactical choices of counsel when they are informed choices. Id.

The Court finds that the Petitioner did not meet his burden of showing that his defense counsel's performance fell below an objective standard and made errors so serious that it fell below the standard of representation guaranteed by the Constitution. The Court also finds the Petitioner has not carried his burden to show that defense counsel's performance prejudiced him and the errors were so serious as to deprive him of a fair trial. Therefore, the Petitioner has failed to satisfy both of the Strickland prongs, and the Court finds that the verdict of the criminal trial in this matter was not the result of the ineffective assistance of [the Petitioner's] counsel.

Finally, regarding the Petitioner's claim regarding the prosecutor's improper comments made during closing arguments, the court held the following:

> Tennessee courts have held that a claim for relief based on prosecutorial misconduct is not "based upon a constitutional right not recognized as existing at the time of trial" or "the result of a state action violation of the federal or state constitution." The [Petitioner's] failure to raise a claim of prosecutorial misconduct during the direct appeal process is, therefore, fatal. See Shifflett v. State, 2011 WL 2732357, at *FN1 (Tenn. Crim. App. July 14, 2011)[;] McCarver v. State, 2010 WL 596344 at *4 (Tenn. Crim. App. Feb. 19, 2010); Brewer v. State, 470 S.W.2d 47, 49 (Tenn. Crim. App. 1970).

> Because the Petitioner failed to raise prosecutorial misconduct on direct appeal, his attempt to raise that as a ground for relief is futile.

On April 18, 2018, the Petitioner filed a timely notice of appeal from the judgment denying coram nobis relief and denying post-conviction relief.

## ANALYSIS

**I.  Denial of Coram Nobis Relief.**  The Petitioner contends that the post-conviction court erred in denying his petition for writ of error coram nobis. He describes the newly discovered evidence as the following: (1) the sworn deposition testimony of the victim and his mother from a contemporaneously filed and related civil case, which he alleges is inconsistent with the testimony they gave at his criminal trial, and (2) the report from Dr. Barbara Ziv, a forensic psychiatrist, which was entered as an exhibit during the February 22, 2018 hearing. The State responds that because the petition for writ of error coram nobis was untimely filed and because tolling of the statute of limitations is not required, the coram nobis court did not err in denying the petition. We agree with the State.

A petition for writ of error coram nobis is available to criminal defendants based on subsequently or newly discovered evidence. Tenn. Code Ann. § 40-26-105(a), (b). However, a writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn.

1999); State v. Workman, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). Coram nobis petitions are governed by Tennessee Code Annotated section 40-26-105, which provides:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. State v. Hall, 461 S.W.3d 469, 496 (Tenn. 2015). If a petition for coram nobis relief is granted, the judgment of conviction will be set aside and a new trial will be granted. Payne v. State, 493 S.W.3d 478, 485 (Tenn. 2016).

Petitions for writ of error coram nobis must satisfy rigorous standards regarding specificity:

> The motion or petition must be in writing and (1) must describe with particularity the nature and substance of the newly discovered evidence and (2) must demonstrate that this evidence qualifies as "newly discovered evidence." In order to be considered "newly discovered evidence," the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible. In addition to describing the form and substance of the evidence and demonstrating that it qualifies as "newly discovered evidence," the prisoner must also demonstrate with particularity (3) why the newly discovered evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence; and (4) how the newly discovered evidence, had it been admitted at trial, may have resulted in a different judgment.

Harris v. State, 301 S.W.3d 141, 152 (Tenn. 2010) (Koch, J., concurring in part and concurring in result) (footnotes omitted), overruled on other grounds by Nunley v. State, 552 S.W.3d 800 (Tenn. 2018).

Summary dismissal, without discovery or an evidentiary hearing, is permissible when a petition is insufficient on its face. Nunley, 552 S.W.3d at 829. As the Nunley court reiterated:

> "The sufficiency of the contents of a petition for writ of error coram nobis filed pursuant to T[enn.] C[ode] A[nn]. § 40-26-105 is of utmost importance. Judges anticipate that the petition itself embodies the best case the petitioner has for relief from the challenged judgment. Thus, the fate of the petitioner's case rests on the ability of the petition to demonstrate that the petitioner is entitled to the extraordinary relief that the writ provides."

Id. at 826 (quoting Harris, 301 S.W.3d at 150 (Koch, J., concurring in part and concurring in result)).

In addition to the requirements regarding specificity, petitions for writ of error coram nobis are subject to a one-year statute of limitations. Tenn. Code Ann. § 27-7-103. The statute of limitations is calculated from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely, post-trial motion. Payne, 493 S.W.3d at 484; Mixon, 983 S.W.2d at 670.

We agree with the State that the Petitioner's coram nobis petition is untimely. Here, the jury rendered their guilty verdicts against the Petitioner on July 12, 2013. Before the judgments of conviction for these offenses were entered, the Petitioner filed a motion for a renewed judgment of acquittal as well as a motion for new trial, both of which the trial court denied by minute entry on September 23, 2013. Thereafter, on November 12, 2013, the trial court entered judgments of convictions for these offenses, which became final on December 12, 2013. Therefore, giving the Petitioner the benefit of the date the final judgments of conviction were entered, the Petitioner had until December 12, 2014, to file his petition for writ of error coram nobis. Nevertheless, the record shows the Petitioner did not file his petition for writ of coram nobis in this case until July 3, 2017, more than two and a half years after the limitations period expired.

Because the coram nobis petition in this case was untimely, we must next consider whether the Petitioner has established that due process concerns require tolling of the

one-year statute of limitations. Workman v. State, 41 S.W.3d 100, 101-02 (Tenn. 2001). Due process requires the tolling of a statute of limitations period when a petitioner would otherwise be denied "'an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" Id. at 102 (quoting Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992)).

Given the extraordinary nature of the writ, petitioners must plead specific facts showing why they are entitled to equitable tolling of the statute of limitations. Id. If the petition for coram nobis relief fails to show on its face that it is filed within the one-year statute of limitations, the petition must set forth with particularity facts showing that the petitioner is entitled to equitable tolling:

> "To be entitled to equitable tolling, a prisoner must demonstrate with particularity in the petition: (1) that the ground or grounds upon which the prisoner is seeking relief are "later arising" grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims . . . . A prisoner is not entitled to equitable tolling to pursue a patently non-meritorious ground for relief."

Nunley, 552 S.W.3d at 829 (quoting Harris, 301 S.W.3d at 153 (Koch, J., concurring in part and concurring in result) (footnotes omitted)). We note that "[w]hether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." Harris, 301 S.W.3d at 145 (citing Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

"If a petition for a writ of error coram nobis fails to show on its face either that it has been timely filed in accordance with Tennessee Code section 27-7-103 or specific facts showing why the petitioner is entitled to equitable tolling of the statute of limitations, the trial court is within its discretion to summarily dismiss it." Nunley, 552 S.W.3d at 829 (citing Harris, 301 S.W.3d at 153) (Koch, J., concurring in part and concurring in result)). The trial court is not required to conduct an evidentiary hearing prior to dismissing a coram nobis petition if the petition "'fails to meet the necessary prerequisites for granting coram nobis relief.'" Id. (quoting Harris, 301 S.W.3d at 153) (Koch, J., concurring in part and concurring in result)). Moreover, "'[i]f the averments in the petition are insufficient to warrant relief, the petition may be dismissed' prior to any response from the state and without a hearing." Id. (quoting Harris, 301 S.W.3d at 153)

(Koch, J., concurring in part and concurring in result)).  After considering the applicable law, we conclude that the court could have summarily dismissed the petition for writ of error coram nobis prior to the evidentiary hearings because the petition was untimely and the initial and amended petitions failed to sufficiently explain why the Petitioner was entitled to equitable tolling of the statute of limitations.  See id.

Moreover, after considering the substance of the February 22, 2018 and March 12, 2018 hearings, we conclude that the Petitioner failed to present any information at these hearings showing that he is entitled to equitable tolling of the one-year statute of limitations.  Although the State's response to the coram nobis petition clearly stated that the petition was untimely and that equitable tolling did not apply, our review of the record shows that the Petitioner has never asserted, in his petitions, in his arguments before the post-conviction court during the aforementioned hearings, or in his appellate brief that he is entitled to equitable tolling of the one-year statute of limitations for coram nobis claims.  Here, the Petitioner has altogether failed to demonstrate "(1) that the ground or grounds upon which the prisoner is seeking relief are 'later arising' grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims . . . ."  Id. at 829.  Because the record shows that petition is not timely and that the Petitioner has failed to demonstrate that he is entitled to relief from the statute of limitations, our "inquiry ends."  Id. at 831.  Accordingly, the Petitioner is not entitled to relief on this issue.

**II.  Denial of Post-Conviction Relief**.  The Petitioner also contends that he is entitled to post-conviction relief because his defense attorneys were ineffective in failing to develop "a complete theory of defense" following the trial court's extremely unfavorable ruling on his Rule 412 motion, which precluded him from proving his innocence by presenting proof that W.C.L. was the perpetrator in this case.  The Petitioner notes that the agreed-upon defense strategy, prior to the court's Rule 412 ruling, was that the victim made false allegations of sexual abuse against him because he was in a sexual relationship with W.C.L. and the victim could not, or would not, retract the allegations because he feared his mother's abuse.  The Petitioner asserts that the victim's false accusations against him arose when the victim's mother asked the victim if someone had been abusing him, and the victim acknowledged that "William" was the person responsible for the abuse.  The Petitioner emphasizes that both he and W.C.L. have the first name of "William."

The Petitioner claims that, following the trial court's extremely unfavorable ruling on his Rule 412 motion, his attorneys should have investigated the victim's false statement that he first met W.C.L. in 2011, should have renewed the Rule 412 motion

- 44 -

after receiving documents showing that the victim and W.C.L. had sexual contact in 2010, and should have obtained a timely forensic psychiatric examination of the victim or, at a minimum, should have retained a forensic psychiatrist to review and summarize the available records to show the victim's untrustworthiness. Specifically, the Petitioner asserts that his attorneys were ineffective (1) in failing to obtain and preserve cell phone records showing that the victim and W.C.L. were communicating in 2010, (2) in failing to call W.C.L. and Detective Mick at trial for the purpose of impeaching the victim's trial testimony that he did not meet W.C.L. until 2011, which was after the victim alleged that the Petitioner abused him; (3) in failing to renew the Rule 412 motion, (4) in failing to consult or call a forensic psychiatrist in this case, and (5) in failing to object and ask for a mistrial in response to the prosecutor's improper comments during closing arguments.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn, 202 S.W.3d at 115 (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose,

523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). The key inquiry regarding the prejudice prong is "'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" Kendrick v. State, 454 S.W.3d 450, 458 (Tenn. 2015) (quoting Lockhart v. Fretwell, 506 U.S. 364, 372 (1993)). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Harrington v. Richter, 562 U.S. 86, 110 (2011) (quoting Strickland, 466 U.S. at 686).

A. **Failure to Obtain and Preserve Cell Phone Records.** The Petitioner argues that his attorneys were ineffective in failing to obtain and preserve the victim's and W.C.L.'s cell phone records. He claims that these cell phone records, which would have shown that the victim and W.C.L. had been communicating in 2010, rather than 2011, were available early in his case and that his attorneys' failure to obtain them was both deficient and prejudicial. The State counters that the Petitioner, in failing to present these cell phone records at the post-conviction hearing, failed to establish that he was prejudiced by counsels' failure to obtain these records.

The Petitioner asserts that prior to the return of the indictment, he informed his attorneys that they needed to obtain these cell phone records. He also says that following the trial court's unfavorable Rule 412 ruling, he repeated his request for counsel to obtain these cell phone records for the purpose of showing that the victim and W.C.L. knew each other in 2010, but his attorneys informed him that there was insufficient time to obtain these records prior to trial. He also notes that following his conviction, Gary Kellar, his attorney in the civil case, sought to obtain these cell phone records but was unable to acquire them because the cell phone provider had destroyed them.

To support his claim regarding the existence of these records, the Petitioner references W.C.L.'s November 9, 2011 interview with Detective Mick of the Franklin Police Department concerning the victim's allegations that W.C.L. forced him to have

anal sex. During this interview, W.C.L. told Detective Mick that the victim texted him in 2010 asking him to send a picture of his penis. The Petitioner also notes that W.C.L. similarly testified at the Rule 412 hearing about the victim texting him with this request.

The Petitioner argues that these cell phone records could have been used to impeach the victim's trial testimony that he met W.C.L. in 2011, after he alleged that the Petitioner abused him. While he acknowledges that the substance of the text messages, i.e. the victim's request for W.C.L. to send him a picture of his penis, "may have been on the fringes of the trial court's [Rule] 412 ruling," he nevertheless contends that proof that the victim and W.C.L. exchanged text messages in 2010 would not have violated the court's ruling.

Initially, we recognize that the Petitioner failed to present the cell phone records or alleged text messages at the post-conviction hearing. Cf. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). However, both the Petitioner and Kellar testified at the post-conviction hearing that these cell phone records were no longer available because the cell phone companies involved only kept these records for a limited period of time. After reviewing the record, it is apparent that establishing that the sexual contact between the victim and W.C.L. occurred in 2010 was the linchpin of not only the Petitioner's Rule 412 motion but also his defense that W.C.L. was responsible for the offenses described in the indictment, rather than the Petitioner. This was an extremely strong defense under the particular facts of this case, and the defense attorneys' failure to competently pursue this defense by failing to obtain and preserve these cell phone records fell below the objective standard of reasonableness under the prevailing professional norms for criminal defense attorneys. See Strickland, 466 U.S. at 687-88. Accordingly, given the particular circumstances present in this case, we conclude that defense counsels' failure to make any attempt to obtain these cell phone records, either before or after the Rule 412 hearing, was deficient. Nevertheless, we conclude that the Petitioner has failed to establish he was prejudiced by his defense attorneys' failure to obtain and preserve these cell phone records. At the post-conviction hearing, the Petitioner not only failed to present these cell phone records but also failed to show that these cell phone records were still in existence when the defense first learned of the sexual contact between the victim and W.C.L, which triggered the need for these records. Therefore, because the Petitioner has failed to establish that he was prejudiced by counsels' failure to obtain and preserve these records, he is not entitled to relief on this issue.

**B.** **Failure to Call W.C.L and Detective Mick to Testify at Trial.** The Petitioner argues that his defense attorneys were also ineffective in failing to call W.C.L.,

- 47 -

and alternatively Detective Mick, to impeach the victim's trial testimony that he never met W.C.L. until 2011. The Petitioner asserts that during a November 9, 2011 interview, W.C.L. told Detective Mick that his sexual contact with the victim, which lasted four to five months, ended when W.C.L. began dating another male in November 2010. In light of this evidence, the Petitioner claims that trial counsel could have called W.C.L. to impeach the victim's false testimony that he did not meet W.C.L. until 2011 and could have presented this testimony without violating the court's Rule 412 ruling, which precluded the defense from using extrinsic evidence to prove whether or when the sexual contact between the victim and W.C.L. occurred. He also claims, citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008) and Tenn. R. Evid. 804, that if W.C.L. had a "memory lapse" or asserted "the right to remain silent" as to when he met the victim, the defense could have called Detective Mick to establish the exact date when W.C.L. met the victim. In response, the State asserts that the Petitioner cannot establish this claim because he failed to call W.C.L. or Detective Mick at the post-conviction hearing.

In its order granting in part and denying in part the defense's Rule 412 motion, the trial court made the following ruling regarding the defense's need to present evidence pursuant to due process:

> The defense argued that evidence regarding the Victim's prior sexual relationship with [W.C.L.] is relevant because regardless of the contradicting testimony as to when the sexual relationship may have occurred, it is clear it falls within the 2007-2010 time frame alleged in the indictment.
>
> . . . .
>
> [T]he Court finds it permissible for the defense to inquire in limited fashion about the Victim's prior sexual relationship with [W.C.L. (such dates that it occurred, how long the sexual relationship lasted, etc.) during the cross-examination of the Victim. Pursuant to Rule 608, specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. If, however, the witness denies the conduct, the party proferring the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence. Tenn. R. Evid. 608(b); State v. Shepherd, 862 S.W.2d 557 (Tenn. Crim. App. 1992). That is, while the Court has found the requirements of Rule 608 have been satisfied, and the defense [can] question the Victim about his previous relationship with [W.C.L.], the defense is not able to introduce any extrinsic testimony or evidence as to the issue, including but not limited to the testimony of

[W.C.L.] or statements from his forensic interview[ (Ex. 3), the cross-examination of [S.B., the victim's mother,], the testimony of Detective Mick, or the Franklin Police Department record (Ex. 4).

As we recognized in the previous section, it was vital for the defense to prove that the sexual contact between the victim and W.C.L. took place in 2010, rather than 2011, in order to convince the jury that W.C.L. was responsible for the sexual offenses described in the indictment. The Rule 412 ruling precluded the use of extrinsic evidence regarding the victim's sexual contact with W.C.L., but it did not preclude the use of extrinsic proof to show when the victim first met W.C.L. The confines of the Rule 412 ruling did not restrict the defense's ability to impeach the victim's testimony that he never met W.C.L. until 2011, an assertion that was wholly at odds with W.C.L.'s November 9, 2011 interview with Detective Mick. Although the Rule 412 ruling prevented the defense from presenting extrinsic evidence that the victim's sexual contact with W.C.L. took place in 2010, before the victim alleged that the Petitioner had sexually abused him, the defense nevertheless argued to the jury in its closing that W.C.L. was the one responsible for committing the offenses in the indictment, rather than the Petitioner. Because this was one of the strongest defenses available to the Petitioner at trial, we conclude that the Petitioner's defense attorneys were deficient in failing to present W.C.L. and/or Detective Mick to show that the victim met W.C.L. in 2009 or 2010, rather than in 2011, after the allegations against the Petitioner arose. This evidence would have corroborated the defense's argument that W.C.L. was the perpetrator in this case, rather than the Petitioner.

However, determining whether the failure to present W.C.L. and/or Detective Mick was prejudicial is a much closer issue. Clearly, the Petitioner failed to present either W.C.L. or Detective Mick at the post-conviction hearing. This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black, 794 S.W.2d at 757. The presentation of the witness at the post-conviction hearing is typically the only way for the petitioner to establish:

(a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

- 49 -

Id. Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id. Although the Petitioner asserts that his defense attorneys should have presented W.C.L. and/or Detective Mick to impeach the victim's trial testimony that he never met W.C.L. until 2011, the Petitioner did not have these individuals testify at the post-conviction hearing. Presenting these witnesses' testimony at the post-conviction hearing would have eliminated the need to speculate on the impeachment value of these witnesses. Moreover, even though W.C.L.'s testimony from the Rule 412 hearing, the November 9, 2011 interview of W.C.L. by Detective Mick, and at least some of Detective Mick's police reports associated with that interview are in the record, we are not convinced that proof that the victim and W.C.L. met in 2010 would have been enough to change the outcome of the Petitioner's trial in light of the trial court's Rule 412 ruling. Because the Petitioner has failed to show that trial counsel's performance to present W.C.L. or Detective Mick for impeachment purposes was prejudicial to this case, he is not entitled to relief.

C. **Failure to Renew Rule 412 Motion.** The Petitioner contends that his defense attorneys were ineffective in failing to renew the Rule 412 motion upon receiving relevant and material evidence showing that the victim and W.C.L. were engaged in a sexual relationship in 2010. He notes that in the December 3, 2012 order, the trial court released certain records that had been filed under seal before Judge Watkins recused himself from the case. The records released pursuant to this order included (1) the DCS records regarding the victim's allegations against the Petitioner and "another accused," presumably W.C.L., and (2) a December 16, 2011 investigative summary by Detective Mick of the Franklin Police Department, presumably concerning the victim's allegations that W.C.L. had sexually abused him. The Petitioner notes that the December 3, 2012 order states that the court "shall hold a [Rule] 412 hearing to determine what specific information and documents are admissible at trial" and that "[t]he 412 hearing is scheduled for Tuesday, February 19, 2013, at 9:00 a.m."

The Petitioner asserts that when trial counsel was asked at the post-conviction hearing why the defense did not present the DCS records and Detective Mick's investigative report during the Rule 412 hearing to prove that W.C.L.'s contact with the victim occurred in 2010, she replied that the defense had not received those records in time for the Rule 412 hearing.

The Petitioner then asserts that "[r]egardless of when the recorded proof of the specific incidents of sexual conduct between [the victim] and [W.C.L.] came into possession" of the defense, his attorneys "did not renew [Rule] 412 motion" seeking

admissibility of this evidence in order to allow the Petitioner to present a "complete defense." He also contends that his defense attorneys missed an opportunity to introduce evidence of W.C.L.'s sexual contact with the victim in 2010 under Tennessee Rule of Evidence 412(c)(4)(ii) as proof of specific incidents of sexual conduct offered for the purpose of showing the victim's knowledge of sexual matters. The Petitioner asserts that proof of specific instances of sexual conduct between W.C.L. and the victim that occurred prior to the accusations against the Petitioner served to rebut the prosecutor's closing argument to the jury that the victim must have learned about sexual activity from the Petitioner. The Petitioner argues that "with proof of specific instances of sexual conduct between [the victim] and [W.C.L.] in 2010 recorded in government records—and the subpoena power to produce the witnesses with [the] knowledge identified in the records," his defense attorneys were ineffective in failing to renew the Rule 412 motion. He adds that revisiting the Rule 412 motion with this proof "was critical to provide a defense as guaranteed under the Tennessee and the United States Constitution" and was necessary "to explain how [the] 12[-]year[-]old [victim] had knowledge of sexual matters." The State counters that the Petitioner failed to prove by clear and convincing evidence that his defense attorneys failed to renew the Rule 412 motion and that but for this alleged deficiency, the trial court would have admitted the records.

After reviewing the record from trial, we note that while the Petitioner's defense attorneys did unsuccessfully renew the Rule 412 motion during trial for the purpose of seeking admission of school records showing that the victim, at four years old, had sexual contact with another student, the defense attorneys never renewed the Rule 412 motion to seek admission of evidence of specific instances of sexual conduct between the victim and W.C.L. that occurred in 2010. As we previously recognized, the Petitioner filed a Rule 412 motion requesting permission to introduce proof regarding the victim's sexual contact with W.C.L. during the period covered by the indictment. The Petitioner wanted to present this evidence because it tended to show that W.C.L. committed the offenses in the indictment, rather than the Petitioner.

Tennessee's rape shield rule, which is found in Tennessee Rule of Evidence 412, "recognizes that, despite the embarrassing nature of the proof, sometimes the accused can only have a fair trial if permitted to introduce evidence of the alleged victim's sexual history." Tenn. R. Evid. 412, Advisory Comm'n Cmts. (1991). Rule 412's "purpose is to exclude all evidence regarding the complainant's prior sexual behavior unless the procedural protocol is followed and the evidence conforms to the specifications of the Rule." State v. Brown, 29 S.W.3d 427, 430 (Tenn. 2000).

The provisions of Rule 412 applicable to the evidence proffered in this case provide in pertinent part:

**(c) Specific Instances of Conduct.** Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:

(1) Required by the Tennessee or United States Constitution, or

. . . .

(4) If the sexual behavior was with persons other than the accused,

. . . .

(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters[.]

Tenn. R. Evid. 412(c)(1), (4)(ii).

At the very beginning of the Rule 412 hearing, the trial court ruled that the February 2003 incident involving sexual contact between the victim, at age four, and another child was "irrelevant to the instant case" and that the Vanderbilt Medical Records, which showed the victim's knowledge of sexual matters based on homosexual pornography and sexual relationships with male peers were "extrinsic records not admissible at trial." Accordingly, the Petitioner only sought permission to introduce the following proof: "Evidence of [of the alleged victim's] Sexual Conduct with [W.C.L.] offered pursuant to Rule 412(c)(1) and (4)[.]" While defense counsel initially argued that this evidence should be admitted pursuant to the confrontation clause for the purpose of cross-examining the victim at trial regarding his sexual contact with W.C.L., the transcript from the Rule 412 hearings makes it clear that the defense also sought admission of this evidence pursuant to his right to present a defense, which includes the right to present witnesses in one's own behalf. See Brown, 29 S.W.3d at 431 (citing Chambers v. Mississippi, 410 U.S. 284, 294 (1973); State v. Sheline, 955 S.W.2d 42, 47 (Tenn. 1997)).

At the Rule 412 hearings, the Petitioner presented the testimony of W.C.L. and the recorded interview of W.C.L. conducted by DCS and the Franklin Police Department. Although W.C.L. testified at the Rule 412 hearing that he could not remember when his sexual contact with the victim occurred, W.C.L. made the following statements during his recorded interview: (1) that he and the victim had sexual contact over a period of four to five months and that all of his sexual contact with the victim ended prior to November

2010, and (2) that his sexual contact with the victim ended because W.C.L. had wanted to date another male prior to November 2010 and that W.C.L. had subsequently dated two other male peers in January 2011 and February 2011.

Defense counsel argued that he sought to present W.C.L.'s testimony and W.C.L.'s recorded interview to show that W.C.L. committed the acts described in the indictment, rather than the Petitioner. Because the intended purpose of the admission of this evidence comported with Rule 412(c)(1) and (c)(4)(ii) and the probative value of the evidence outweighed any unfair prejudice to the complainant, we conclude that the proffered evidence satisfied the threshold admissibility requirements of Rule 412. See id. at 431.

Although Brown acknowledged that the right to present witnesses was not absolute, the procedural and evidentiary rules that limit this right may not be applied to defeat the ends of justice:

> Although "[t]he right to present witnesses is of critical importance . . . it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process." Chambers, 410 U.S at 295, 93 S. Ct. at 1046. Specifically, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id. at 302, 93 S. Ct. at 1049. However, these procedural and evidentiary rules of exclusion "may not be applied mechanistically to defeat the ends of justice." Id. "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" United States v. Scheffer, 523 U.S. 303, 118 S. Ct. 1261, 1264, 140 L.Ed.2d 413 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 56, 107 S. Ct. 2704, 2711, 97 L.Ed.2d 37 (1987)).

Id. at 432-33. The Brown court then noted that the constitutional right to present a defense had been held to "trump" the rule against hearsay and as well as several rules of state and federal rules of procedure and evidence, including rape shield statutes. Id. at 433. It concluded that "[t]he facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence" and that "[g]enerally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability;

and (3) the interest supporting exclusion of the evidence is substantially important." Id. at 433-34 (citing Chambers, 410 U.S. at 298-301) (footnote omitted).

As pertinent to the Petitioner's case, Brown recognized the critical difference between impeachment evidence and substantive rebuttal evidence:

> Part of the flaw in the dissent's analysis of the issue in this case results from the dissent's failure to recognize that a defendant has both the right to cross-examine witnesses presented by the State and the right to present witnesses in his or her own behalf. . . . The dissent's analysis is also flawed in that it draws no distinction between impeachment evidence and substantive rebuttal evidence. The two types of proof clearly are not equivalent. A jury considers impeachment proof only when assessing the credibility of witnesses. See State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998) (Holder, J.) (citing State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982) for the proposition that prior inconsistent statements may be considered only on the issue of credibility and not as substantive evidence). . . . Therefore, unless the dissent is proposing a change in current Tennessee law, simply following Tennessee Rule of Evidence 613 would not have afforded to the defendant his right to offer substantive rebuttal proof which was crucial to explain the State's medical proof and necessary to establish a defense.

Id. at 432 n.11 (emphasis added).

The trial court's Rule 412 order shows that it failed to make the critical distinction between impeachment evidence that relates to the Petitioner's right to cross-examine witnesses regarding their credibility and substantive rebuttal evidence that relates to the Petitioner's right to present witnesses in his own behalf. Because the trial court erroneously limited its ruling to whether the proffered evidence was admissible as impeachment evidence, in violation of Brown, we conclude that the defense attorneys were deficient in failing to renew the Rule 412 motion in an effort to have the proffered evidence admitted as substantive rebuttal evidence pursuant to the Petitioner's right to present a defense.

We also conclude that the defense attorneys' failure to renew the Rule 412 motion was prejudicial. As we have repeatedly emphasized, the timing of the sexual contact between the victim and W.C.L. was crucial in showing that W.C.L. was responsible for the offenses described in indictment, rather than the Petitioner. Because this was such a

viable defense under the particular facts of this case, the defense attorneys' failure to competently pursue this defense fell below the objective standard of reasonableness for attorneys in criminal cases. See Strickland, 466 U.S. at 687-88. In light of the extremely unfavorable and problematic Rule 412 ruling, which unduly limited the Petitioner's defense, the defense attorneys' failure to renew the Rule 412 motion was prejudicial. We believe that the Petitioner has demonstrated that but for the defense attorneys' unprofessional errors regarding this Rule 412 motion, the result of both the Rule 412 hearing and his trial would have been different.

We also conclude that the defense attorneys were ineffective in failing to renew their motion under Rule 412(c)(4)(ii) when it became clear that the prosecution was going to present evidence at trial and argue to the jury that all of the victim's sexual knowledge was gained as a result of the Petitioner's abuse. Evidence disclosed during discovery and over the course of the Petitioner's case showed that the victim, prior to November 2010, had obtained sexual knowledge from his sexual contact with W.C.L.

The prosecution presented several pieces of evidence showing that the victim obtained all of his sexual knowledge from the Petitioner's abuse of him. The victim testified at trial that he did not know what fellatio was until the Petitioner showed him how to do it. William Edward Arnold, 2015 WL 99272, at *2. The victim also described the Petitioner's ejaculate as "some wet and sticky stuff or something like that." Id. In addition, the victim said he felt "confused" because some of the things the Defendant did to him felt "good," but he wondered why they could not have a "normal mentor relationship." Id. at *3. Moreover, the victim testified that he met W.C.L. in 2011, after the mentor relationship with the Petitioner ended and that the victim had wanted "to feel good with [W.C.L.] because of things [he] learned from [the Petitioner]." Id. Furthermore, the prosecution also presented proof that when the victim was asked during his medical examination in late 2010 if he had any sexual contact with his peers, the victim responded that he had sexual contact only with "the person that touched me." Id. In addition, during closing arguments, the prosecution argued to the jury that the only way for the young victim to have gained this sexual knowledge was from the Petitioner's abuse of him.

Because the record shows that the prosecution repeatedly presented evidence and argument that all of the victim's sexual knowledge came from the Petitioner's abuse, we conclude that it was deficient for the defense attorneys not to object and renew the Rule 412 motion in an effort to get this proof of the victim's prior sexual knowledge before the jury. We also conclude that the defense's failure to object and renew its Rule 412 motion when presented with this evidence and argument was prejudicial because it allowed the jury to infer that the twelve-year-old victim was sexually innocent prior to the

Petitioner's abuse, a finding that was at odds with evidence available in this case and fatal to the Petitioner's success at trial.

**D.** **<u>Failure to Retain a Forensic Psychiatrist.</u>** The Petitioner argues that his defense attorneys were ineffective in failing to retain a forensic psychiatrist, like Dr. Ziv, to evaluate the victim or, alternatively, to review and summarize the available records in order to show that the victim falsely accused him. He claims that because there was no physical evidence, no medical proof, no confession, no inculpatory controlled telephone calls, and no other evidence to corroborate the victim's allegations, a psychiatric evaluation of the victim was warranted to determine the trustworthiness of the victim. Alternatively, the Petitioner claims that even if the trial court refused to grant him a psychiatric evaluation of the victim, his case would have greatly benefitted from a forensic psychiatric expert reviewing the available records. The Petitioner asserts there is a reasonable probability that, had his defense attorneys presented a forensic psychiatrist to testify that the sexual contact between the victim and W.C.L. in 2010 explained why the victim falsely accused the Petitioner, the outcome of both his Rule 412 hearing and his trial would have been different.

The Petitioner notes that, following his convictions and pursuant to a court order in the civil case, Dr. Ziv conducted a thorough evaluation of the victim. He asserts that Dr. Ziv specifically concluded that the Petitioner was not guilty of sexually abusing the victim, that the Petitioner did not exhibit behaviors that were consistent with those of a pedophile or child abuser, that the manner by which the victim identified the Petitioner as the perpetrator strongly indicated coercion by the victim's mother, that the victim's accounts of the Petitioner's sexual assaults were inconsistent, that the victim's descriptions of the Petitioner's abuse were strikingly similar to the victim's sexual contact with W.C.L. prior to November 2010, and that the victim's mother had made false allegations that the victim had been sexually abused before the allegations against the Petitioner arose.

In evaluating whether counsel's representation fell below the prevailing professional norms, we reiterate that a criminal defendant is not entitled to perfect representation, only constitutionally adequate representation. <u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. 1996). Accordingly, the question, under <u>Strickland's</u> deficient performance prong, is "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." <u>Harrington</u>, 562 U.S. at 105 (quoting <u>Strickland</u>, 466 U.S. at 690). In evaluating an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>State v. Burns</u>, 6 S.W.3d 453, 462 (Tenn. 1999) (citing <u>Strickland</u>, 466 U.S. at 689). In addition, we must avoid the "distorting effects of

hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689, 690. We recognize that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. at 689. "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." Harrington, 562 U.S. at 106 (quoting Strickland, 466 U.S. at 689).

"No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369). Trial counsel have a duty to make reasonable investigations, and a decision not to investigate will be reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91; see Holladay v. Haley, 209 F.3d 1243, 1251-52 (11th Cir. 2000) (concluding that an attorney's investigation is not "reasonable" under Strickland when the facts show that counsel had "notice" that a particular investigation could substantially benefit his client, and he failed to pursue it).

We also recognize that "[i]n most cases . . . the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that Strickland v. Washington shields from scrutiny." Kendrick, 454 S.W.3d at 475. Nevertheless, there are certain types of cases that "hinge[] on expert forensic science testimony." Id. at 477; see Gersten v. Senkowski, 426 F.3d 588, 607-11 (2d Cir. 2005) (stating that defense counsel's failure "to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse" was deficient because "[t]he prosecution's entire case rested on the credibility of the alleged victim's testimony").

Here, the record reflects that the victim provided the only evidence of the abuse and that the victim's credibility was critical to the State's case. There was no physical evidence connecting the Petitioner to the offenses, no medical evidence that any abuse occurred, and no confession. The evidence at trial was limited to direct evidence from the victim and to supporting evidence from the victim's mother, law enforcement, the forensic social worker, the nurse practitioner, and the forensic interviewer that was based solely on what the victim told them about the alleged abuse. Because there was no direct medical evidence corroborating the alleged abuse and no physical evidence connecting

the Petitioner to the alleged offenses, the prosecution was unable to present any evidence at trial, other than the victim's testimony, that a crime actually occurred.

The Petitioner first argues that his defense attorneys were ineffective in failing to retain a forensic psychiatrist, like Dr. Ziv, to evaluate the victim. The Tennessee Supreme Court has held that a trial court has the discretion to compel psychiatric and/or psychological examinations of a victim:

> [I]n any case involving a sex violation, the trial judge has the inherent power to compel a psychiatric or psychological examination of the victim, where such examination is necessary to insure a just and orderly disposition of the cause. Such power should be invoked only for the most compelling of reasons, all of which must be documented in the record. This discretion should be exercised sparingly.

Forbes v. State, 559 S.W.2d 318, 321 (Tenn. 1977). Such a motion must be made on a timely basis. Id. "Compelling reasons" for requiring a psychiatric or psychological examination of the victim include situations "'where substantial doubt is cast upon the victim's sanity, or where there is a record of prior mental disorders or sexual fantasies, or where the story is incredible, and even in these situations, only if there is little or no corroboration to support the charge.'" State v. Gibson, 973 S.W.2d 231, 245 (Tenn. Crim. App. 1997) (quoting State v. Ballard, 714 S.W.2d 284, 287 (Tenn. Crim. App. 1986)). "The purpose of a court-ordered psychological examination of a complaining witness or victim is 'to determine whether or not the emotional or mental condition of the witness may affect [the witnesses'] ability to tell the truth.'" State v. Craig Allen Lewis, No. 01C01-9307-CC-00232, 1995 WL 10509, *5 (Tenn. Crim. App., at Nashville, Jan. 12, 1995) (quoting People v. Francis, 85 Cal. Rptr. 61, 64 (Cal. Ct. App. 1970)). A psychiatric or psychological examination should be conducted "only when it might yield relevant evidence of the existence of a substantial mental impairment." Id. at *5 (citing Newsome v. State, 782 P.2d 689, 690 (Alaska Ct. App.1989)).

Initially, we recognize there was substantial evidence in the record indicating that the victim was raised by an abusive mother and was unable to come to terms with his sexuality, especially given his mother's belief that homosexuality was a sin. This evidence suggested that the victim may have falsely accused the Petitioner in order to prevent his mother from discovering his sexual contact with W.C.L. While these circumstances are significant and provide support for the defense's argument that the Petitioner was falsely accused, we do not feel they rise to the level of "compelling reasons" necessitating a psychiatric examination of the victim. Had the defense asked the

trial court for permission to conduct a psychiatric evaluation of the victim based on these circumstances, the record does not reflect that the court would have granted the request in light of well-established precedent on this issue. See Gibson, 973 S.W.2d at 245; State v. Isaiah Burton, Jr., No. M2005-00690-CCA-R3-CD, 2006 WL 1896364, at *16-17 (Tenn. Crim. App. July 7, 2006); State v. John D Cooke, III, No. W1998-01767-CCA-R3-CD, 1999 WL 1531347, at *7-8 (Tenn. Crim. App. Dec. 28, 1999). Consequently, we conclude that the defense attorneys' failure to retain a forensic psychiatrist for the purpose of evaluating the victim was neither deficient nor prejudicial.

However, we note that the question of whether the defense attorneys were ineffective in failing to consult with or call a psychiatric expert is a far closer issue. In the Petitioner's case, where the only direct evidence that any crime occurred was the testimony from the alleged victim, psychiatric expert consultation and psychiatric expert testimony, if admissible, could have been helpful to the defense's Rule 412 motion because it would have supported the defense's claim that W.C.L. had committed the offenses in the indictment, rather than the Petitioner. Gersten, 426 F.3d at 608 (citing Eze v. Senkowski, 321 F.3d 110, 128 (2d Cir. 2003); Pavel v. Hollins, 261 F.3d 210, 224 (2d Cir. 2001); Lindstadt v. Keane, 239 F.3d 191, 201 (2d Cir. 2001)). Following the adverse and problematic Rule 412 ruling, the defense's need for a strong, cohesive defense strategy became even greater. We find it significant that the defense attorneys, after receiving a nearly fatal Rule 412 ruling, never adjusted their strategy for trial, which left the Petitioner with no defense theory other than his own claim that he was innocent. We reiterate that the Rule 412 ruling precluded the defense from presenting any evidence that W.C.L. committed the charged offenses against the victim, rather than the Petitioner. Trial counsel admitted during the post-conviction hearing that there was no viable alibi defense because of the vagueness of the State's response to the request for a bill of particulars; she also admitted that there were problems with presenting a lack of opportunity defense because there was a small period of time for which the defense could not account. Trial counsel ultimately acknowledged that the only defense theory presented at trial was to have the Petitioner testify that he did not commit these offenses. Although trial counsel said that the defense also presented evidence from two witnesses regarding the Petitioner's good character, she acknowledged that good character was not a defense to charges of sexual abuse.

We recognize that following the devastating Rule 412 ruling, which eliminated the Petitioner's best defense of presenting substantive rebuttal evidence at trial that W.C.L. had committed the charged offenses, the case came down to a credibility contest between the victim and the Petitioner. The trial transcript shows that aside from the Petitioner's testimony, the only witnesses presented by the defense were the Petitioner's father and his friend, who were character witnesses. The record does not indicate that this was a case where the defense attorneys, who had been retained, faced "limited resources" that

precluded their ability to retain an expert or pursue a different defense strategy. See Harrington, 562 U.S. at 107. Nor was this a case where the defense attorneys did not have sufficient time in which to consult with a forensic psychiatrist or other expert. See State v. Denz, 306 P.3d 98, 103 (Ariz. Ct. App. 2013). We feel strongly, based on the circumstances in this case, that it would have been "best practices" for defense counsel to have presented a cohesive, multifaceted defense strategy rather than simply having the Petitioner testify that he did not commit these offenses. However, because we cannot say that defense counsels' failure to consult with or call a psychiatric expert fell below the objective standard of reasonableness under prevailing professional norms for criminal defense attorneys, we are constrained to conclude that defense counsels' performance as to this issue was not deficient and that the Petitioner did not suffer any prejudice as a result.

### E. Failure to Object to Prosecutor's Comments During Closing Arguments.

Lastly, the Petitioner contends that his trial attorneys' failure to object to the prosecutor's improper comments during closing argument and rebuttal closing argument denied him effective assistance of counsel and violated his rights to due process and a fair trial under Article I, Section 9 of the Tennessee Constitution and the Fifth, Sixth, and Fourteen Amendments to the United States Constitution.

Initially, we note that while the Petitioner makes the stand-alone claims that his right to due process and his right to a fair trial were violated by the prosecutor's comments during closing, he has waived these claims by failing to raise these issues at trial, in his motion for new trial or on direct appeal. See Tenn. Code Ann. § 40-30-106(g); State v. Townes, 56 S.W.3d 30, 35 (Tenn. Crim. App. 2000), overruled on other grounds by State v. Terry, 118 S.W.3d 355 (Tenn. 2003). Consequently, he is not entitled to relief on those claims. However, we will consider the Petitioner's claim that his defense attorneys were ineffective in failing to object to the prosecutor's improper comments during closing arguments.

Initially, we recognize that while trial counsel was never asked about her failure to object or request a mistrial in response to the prosecutor's comments during closing arguments, the Petitioner did present expert testimony from Don Dawson, the Post-Conviction Defender for the State of Tennessee from 1996-2012, on this issue. During the post-conviction hearing, Dawson testified as an expert on the propriety of the prosecutor's comments during closing arguments and on the defense's failure to object to these comments. Dawson reviewed the transcript from closing arguments, the video recording of these arguments, a video recording of the Petitioner's testimony, and the December 3, 2012 order entered by the trial court releasing certain documents under seal to both parties. He then prepared two different documents: the first identified sections of the prosecutor's improper closing argument as well as the applicable ABA Standards

Relating to the Prosecution Function, Rules of Professional Conduct, and case law that were violated by the prosecutor's comments, and the second document focused on the prosecution's improper use of inferences that were rebutted by evidence that the trial court had excluded pursuant to the Rule 412 ruling.

Closing arguments function "to sharpen and to clarify the issues that must be resolved in a criminal case." State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008) (citing Herring v. New York, 422 U.S. 853, 862 (1975)). They also enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. (citing Christian v. State, 555 S.W.2d 863, 866 (Tenn. 1977)). Because counsel in criminal cases "are expected to be zealous advocates," they should be afforded "great latitude in both the style and the substance of their arguments." Id. at 130-31.

However, prosecutors, "while permitted to advocate for the interests of the State 'with thoroughness and vigor,' . . . must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" State v. Hawkins, 519 S.W.3d 1, 47-48 (Tenn. 2017) (quoting Banks, 271 S.W.3d at 131). "[P]rosecutors 'may strike hard blows, . . . [but they are] not at liberty to strike foul ones.'" Banks, 271 S.W.3d at 131 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). "'[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'" State v. Sexton, 368 S.W.3d 371, 419 (Tenn. 2012) (quoting Berger, 295 U.S. at 88). Consequently, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Banks, 271 S.W.3d at 131 (citing State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999); Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices[.]" Id. (citations omitted).

This court has recognized five general categories of prosecutorial misconduct:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235

(Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing Standards Relating to the Prosecution Function and the Defense Function §§5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

The following five factors should be considered when determining whether the prosecutor's improper argument could have affected the verdict to the prejudice of the defendant:

(1) The conduct complained of viewed in context and in light of the facts and circumstances of the case.

(2) The curative measures undertaken by the court and the prosecution.

(3) The intent of the prosecutor in making the improper statement.

(4) The cumulative effect of the improper conduct and any other errors in the record.

(5) The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see Sexton, 368 S.W.3d at 426; State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

1. **Comments Vouching for the Credibility of the Victim.**[10]  The Petitioner asserts that his defense attorneys were ineffective in failing to object when the prosecutor vouched for the victim's credibility several times during her closing argument:

> Ladies and Gentlemen of the Jury, [the victim] has been honest, he's been straightforward and he's given you details [Exh, 9, p.7].
>
> . . . .
>
> No tricks, no theatrics, and no gimmicks.  Just the plain, honest and painful truth, from [the victim] is what you heard.
>
> . . . .
>
> Now, you all said on Monday or Tuesday if you heard testimony from [the victim], and it came from this box, and after all the proof and all the evidence that you heard that you believed his story, every last one of you nodded to say if I believed it and it came from him, then I could make the hard decision here to sit in judgment and convict.
>
> Well, Ladies and Gentlemen of the Jury, we submit to you that you've heard the story and it's painful and it's honest.

The Petitioner asserts that the aforementioned comments were extremely damaging because the State's case against him hinged on the victim's credibility.  He reiterates that there was no other proof, forensic or otherwise, corroborating the victim's allegations against him.  He also contends that the prosecutor, in an attempt to bolster her case, expressed her opinion that the victim had been honest and that the Petitioner was guilty.  Moreover, the Petitioner claims that the prosecutor's improper comments equated to an unsworn, unchecked testimony that exploited the influence of the prosecutor's office.  See Goltz, 111 S.W.3d at 6-7.

---

[10] We have reordered these issues to reflect the chronological order in which they occurred during closing and rebuttal closing argument.

These comments were exceedingly improper. The Tennessee Supreme Court held that it is unprofessional conduct for a prosecutor during closing argument "to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence" and that "any intentional effort to influence the members of a jury by expressions of personal opinion cannot be condoned." State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989); see Tenn. Sup. Ct. R. 8, § 3.4(e)(3) ("A lawyer shall not . . . in trial . . . state a personal opinion as to the justness of a cause, the credibility of a witness, . . . or the guilt or innocence of an accused[.]"); State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) ("[A] lawyer should not assert his or her personal opinion as to the credibility of a witness, or as to the accused's guilt or innocence."); ABA Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(b) ("The prosecutor should not argue in terms of counsel's personal opinion, and should not imply special or secret knowledge of the truth or of witness credibility."). Accordingly, we conclude the defense attorneys' failure to object to these comments was deficient.

As to whether the Petitioner was prejudiced by the defense's failure to object and ask for a mistrial, we note that the person for whom the prosecutor vouched in this instance was the victim, who provided the only evidence of the Petitioner's guilt. We cannot overemphasize that in this case, there was no physical evidence, no medical evidence, and no other evidence corroborating the victim's allegations against the Petitioner. At the time the prosecutor made these comments, she knowingly disregarded any evidence supporting the theory that the victim had falsely accused the Petitioner because W.C.L. was the perpetrator of these offenses and that the victim's sexual knowledge came from his sexual contact with W.C.L. Under these particular circumstances, we must conclude that the defense attorneys' failure, upon hearing these comments, to object and ask for a mistrial was prejudicial because it allowed the State to demand a guilty verdict in light of the prosecutor's assurances that the victim had been "honest."

2**. Comments Mocking the Petitioner.** The Petitioner asserts that his defense attorneys should have objected and asked for a mistrial after hearing the following comments made by the prosecutor from the witness chair because they were made for the purpose of mocking him, inflaming the jury, and portraying him in a prejudicial manner:

> Finally, Ladies and Gentlemen of the Jury, you heard testimony from the doctor, William E. Arnold. Just yesterday and today you heard testimony from this Dr. Arnold. It didn't happen. That's a lie. Absolutely not. Why? Because I'm Dr. William Edward Arnold, Jr. I'm educated, I hold Doctorate Degrees. In fact I have two. Oh yeah, and I also have a Master's Degree.

I work for the Board of Regents of Tennessee. My suit today is impeccable. I speak the King's English. People trust me, they look up to me. Why wouldn't they? I'm Dr. William Arnold, Jr. I'm a pillar of my community. I volunteer. I mentor young boys, although I gave my own son back. I sit on Boards, I run organizations. Why wouldn't people believe me? After all, I'm Dr. William E. Arnold, Jr.

I'm perfect, unbelievable. Where's my water? I don't even believe I have time for this. I have things to do. Why am I even here?

The Petitioner asserts that the prosecutor's comments served to portray him as "pretentious, indignant, and having a dismissive attitude toward the proceedings" and were not warranted by his conduct on the witness stand. He also claims that these comments violated ABA standards 3-6.8 and 3-6.9. See ABA Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(a) ("[T]he prosecutor should present arguments and a fair summary of the evidence that proves the defendant guilty beyond reasonable doubt. The prosecutor may argue all reasonable inferences from the evidence in the record, unless the prosecutor knows an inference to be false. . . . The prosecutor should not knowingly misstate the evidence in the record, or argue inferences that the prosecutor knows have no good-faith support in the record."); Standard 3-6.9 ("When before a jury, the prosecutor should not knowingly refer to, or argue on the basis of, facts outside the record, unless such facts are matters of common public knowledge based on ordinary human experience, or are matters of which a court clearly may take judicial notice, or are facts the prosecutor reasonably believes will be entered into the record at that proceeding.").

In considering the defense's ineffectiveness in failing to object to these comments, we recognize that "[a]rguments which rely upon racial, religious, ethnic, political, economic or other prejudices of the jurors introduce elements of irrelevance and irrationality into the trial which cannot be tolerated in a society based upon the equality of all citizens before the law." Goltz, 111 S.W.3d at 7; see ABA Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(c) ("The prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact. The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty."). Moreover, "[i]f the jury's pre-disposition against some particular segment of society is exploited to stigmatize the accused or his witnesses, such argument has clearly trespassed the bounds of reasonable inference or fair comment on the evidence." Goltz, 111 S.W.3d at 7-8. In light of this authority, we can easily conclude that the defense attorney's failure

- 65 -

to object and ask for a mistrial in response to the prosecutor's comments and behavior was deficient.

After reviewing the trial transcript, transcript of closing arguments, video recording of the Petitioner's testimony at trial, and the video recording of the prosecutor's closing argument, we conclude that the prosecutor's comments and behavior were overwhelmingly inflammatory and were obviously made to appeal to improper prejudices of the jury. The video recording shows that when the prosecutor first sat down in the witness chair during her closing, the trial court expressed visible concern. Thereafter, the prosecutor, still sitting in the witness chair, proceeded to pretend that she was the Petitioner and mocked him, his accomplishments, and his work history, which had nothing to do with the evidence in the case, for the purpose of destroying him in the eyes of the jury. During the entirety of the prosecutor's diatribe, the defense attorneys never objected and asked for a mistrial, despite the overwhelmingly inflammatory nature of the prosecutor's behavior and comments. While trial counsel, during her closing, did reference the prosecutor's actions when she asserted that this was not "Saturday Night Live," the damage to the Petitioner had already been done. When considering the prejudicial nature of the defense's failure to object and ask for a mistrial in response to these comments, Dawson testified that in all his years of experience, he had never seen a prosecutor sit in the witness chair and mock the defendant during closing arguments. Dawson noted that the prosecutor's "head movements" and "eye movement[s]" were made for the purpose of showing that the Petitioner was pretending to be something that he was not and that the Petitioner had a dismissive attitude toward the proceedings. Given the limited proof against the Petitioner as well as the fact that the trial was essentially a credibility contest between the victim and the Petitioner, we conclude that the defense's failure to object or ask for a mistrial after observing the prosecutor's behavior was highly prejudicial.

**3.** **Comments Characterizing the Petitioner as an Animal.** The Petitioner also argues that his defense attorneys were ineffective in failing to object when the prosecutor then improperly characterized him as a wolf in sheep's clothing during closing argument:

Back when we were doing voir dire, we talked about looks being deceiving. And I think I asked you all whether or not you are familiar with the wolf in the sheep's clothing story.

A wolf found great difficulty in getting after sheep because of the vigilance of the shepherd and her dogs. But one day he found a skin of a sheep that had been thrown away. So he donned the skin on his own pelt and strolled down amongst the sheep. A lamb saw the wolf wearing the

- 66 -

sheep's clothing and believed it to be the sheep. And the lamb began to follow the wolf.

The wolf, after leading the lamb away from the herd, soon made a meal of him. And from time to time he succeeded in deceiving the sheep, enjoying the hearty meal.

And Ladies and Gentlemen, the moral to this story [is] that looks are deceiving. We ask that when you deliberate you go back and you find William Arnold, Jr. guilty of one count of aggravated sexual battery and three counts of rape of a child.

The Petitioner asserts that characterizing him as an animal is improper, see Darden v. Wainwright, 477 U.S. 168, 179-181 (1986), and that the prosecutor made this comment for the purpose of inflaming the jury. While we do not believe that these comments, standing alone, would be sufficient to establish the prejudice prong required for ineffectiveness, when these comments are considered against the background of the prior two exceedingly inflammatory and improper comments and actions, it becomes apparent that the instant comments served to further alienate and stigmatize the Petitioner and were made with an intent to appeal to improper prejudices of the jury. Accordingly, we conclude that the defense attorneys' failure to object and ask for a mistrial in response to these comments was both deficient and prejudicial.

**4. Comments Raising Inferences that Had No Support in the Record.** The Petitioner contends that the prosecutor made several comments during rebuttal closing argument that raised the inference that the victim's knowledge of sexual matters could have only come from the Petitioner. He specifically takes issue with the following comments made by the prosecutor during rebuttal closing argument:

How would a twelve year old boy know that people do that? And we all, as adults, know that can be how things go sometimes in intimate encounters.

. . . .

They want to tell you that [the victim] learned sex from somewhere else, not from their client, even though the only testimony, the only proof, the only evidence of where he learned sexual activity in this trial was that he learned it from this guy.

[Trial counsel] suggests a whole lot of other possible ways that he could have learned it and they really, really, really want it to be from [W.C.L.]. I think [the victim] testified he'd answered that question, the question that's been asked of him so many times, when did you meet [W.C.L.]? You met him in two thousand ten, didn't you, before you disclosed [the Petitioner's abuse], didn't you? You started having sex with [W.C.L.] in two thousand ten, didn't you? And his answer has been no, no, no, no, no.

I got to know him in two thousand eleven, I had my relationship with him for a few months thereafter. It was after I told about what had happened with [the Petitioner], it was after the police were involved, it was while this case was pending. No.

They don't want to buy it because it would be a—maybe halfway decent defense if it were true. But it's not. It's desperate, is what it is. Make up a story, make up a defense that doesn't exist in the facts.

The Petitioner asserts that when these comments were made, the prosecutor was aware of evidence showing not only that the victim had learned about sexual matters during his sexual relationship with W.C.L. in 2010 but also that the victim had viewed pornography at an early age. Although the Petitioner acknowledges that such evidence was barred from admission at trial pursuant to the court's Rule 412 ruling, he nevertheless asserts that the prosecutor was aware of this evidence at the time she made these comments. See ABA Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(a) ("The prosecutor may argue all reasonable inferences from the evidence in the record, unless the prosecutor knows an inference to be false. . . . The prosecutor should not knowingly mistake the evidence in the record, or argue interferences that the prosecutor knows have no good-faith support in the record."); Goltz, 111 S.W.3d at 6 ("[I]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as the inferences it may draw."). Given that these comments were knowingly false, we conclude that the defense attorneys' failure to object and ask for a mistrial at the first sign of these comments was deficient.

As we have previously concluded, the Rule 412 ruling precluded the Petitioner from presenting any substantive rebuttal evidence that W.C.L. was the perpetrator of the charged offenses and prevented the Petitioner from presenting any proof that the victim actually gained his sexual knowledge from his sexual contact with W.C.L. in 2010. The

prosecutor, after receiving this flawed Rule 412 ruling, then sought to exploit the ruling by arguing to the jury that the only way the victim could have obtained the sexual knowledge he disclosed at trial was from the Petitioner's abuse of him. At the post-conviction hearing, Dawson specifically testified that the prosecutor's assertion that there was no other way for the victim to have this sexual knowledge unless he had been abused by the Petitioner was an extremely powerful argument that would have "just resonate[d]" with any juror who had not yet made up his or her mind about the case. We agree. By failing to object and to ask for a mistrial, the defense attorneys solidified this extremely false inference in the eyes of the jury. Consequently, we also conclude that the defense attorneys' failure to object and ask for a mistrial in response to these comments was prejudicial.

        **5**.   **<u>Comments Injecting Issues Broader than Guilt or Innocence.</u>**  The Petitioner additionally claims that his defense attorneys should have objected to the following comments made by the prosecutor during her rebuttal closing argument, which diverted the jury from its duty to decide the case on the evidence by injecting issues broader than the Petitioner's guilt or innocence:

> The question [the victim] asked is, "Do you think this will affect me the rest of my life?"

> Ladies and Gentleman, there is nothing you can do with your verdict that will undo all the damage that William Arnold has created in [the victim's] life. There is nothing you can do with your verdict that will correct the indignities and the shame and the physical pain and the suffering that William Arnold created in [the victim's] life.

> Those things probably will affect him for the rest of his life. But there is something you can do with your verdict that will also affect him the rest of his life. He'll know, with your verdict, that he got justice, that he was believed, and that the person who hurt him was held accountable.

        The Petitioner argues that these comments specifically injected issues broader than guilt or innocence, <u>see</u> <u>id.</u> at 8, by suggesting that the victim would suffer "indignities, shame, physical pain and suffering" for the rest of his life because of the Petitioner's abuse. The Petitioner also claims that these comments improperly sent the message that

the jury could "heal" the victim and that the jury could achieve a goal of helping all victims of sexual assault by returning a guilty verdict.

These comments, which were not based on the proof, were inflammatory and improper and were clearly made with the intent to evoke sympathy for the victim. See State v. Ahmon Watkins, No. M2017-01600-CCA-R3-CD, 2019 WL 1370970, at *14 (Tenn. Crim. App. Mar. 26, 2019). Accordingly, we conclude that the defense attorneys' failure to object and ask for a mistrial in response to these comments was deficient. When determining whether this deficiency resulted in prejudice, we recognize that aforementioned comments, when viewed only in isolation, may not have affected the results of the Petitioner's trial. See id. However, it is clear that when these comments are considered along with the other substantial errors that occurred in this case, as well as the lack of overwhelming evidence to support the guilty verdicts, we conclude that the defense's failure to object and ask for a mistrial upon hearing these comments was, in fact, prejudicial to the Petitioner's case.

## CONCLUSION

Based on the foregoing and the record as a whole, we reverse the denial of post-conviction relief. Accordingly, the Petitioner's convictions and sentences are reversed and vacated, and this case is remanded to the trial court for a new trial and for any necessary pre-trial motions.

_____
CAMILLE R. MCMULLEN, JUDGE